**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**EXHIBIT 1**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNIFIED SCHOOL DISTRICT NO. 500, WYANDOTTE COUNTY, STATE OF KANSAS,**<br><br>**Defendant.** | ) | **Case No. 26-2519-JAR-ADM** |

**DECLARATION OF DAWN DOWNING**

1. I am over the age of 18, am competent to give testimony in a court of law. I have personal knowledge of the facts recited in this Declaration.

2. I am currently the Deputy Clerk of the Board of Education.

3. A copy of Board Policy JR is attached hereto as Exhibit A to this Declaration and is a true and accurate copy of this document.

4. A copy of Board Policy JRA is attached hereto as Exhibit B to this Declaration and is a true and accurate copy of this document.

5. A copy of Board Policy JRB is attached hereto as Exhibit C to this Declaration and is a true and accurate copy of this document.

6. A copy of Board Policy JRC is attached hereto as Exhibit D to this Declaration and is a true and accurate copy of this document.

7. A copy of Board Policy JRD is attached hereto as Exhibit E to this Declaration and is a true and accurate copy of this document.

8. A copy of Board Policy IDAE is attached hereto as Exhibit F to this Declaration and is a true and accurate copy of this document.

9. A copy of Board Policy N, General Order 20.2 is attached hereto as Exhibit G to this Declaration and is a true and accurate copy of this document.

10. A copy of USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document is attached hereto as Exhibit H to this Declaration and is a true and accurate copy of this document.

11. Information on FERPA is shared with families in the Parent Student Handbook, Annual Notice to parents Authorized Student Data Disclosures, Family Education Rights Privacy Act (FERPA), media Waiver/internet publishing and parents' Right to Know which are maintained on the school district's website located at:

https://www.kckschools.org/families-students/parent-student-handbook

https://www.kckschools.org/families-students/privacy-information-for-parents-and-students

12. A copy of the August 12, 2026 letter from the U.S. Department of Justice to the General Counsel for USD 500 is attached as Exhibit I to this Declaration and is a true and accurate copy of this document.

13. A copy of the August 11, 2026 letter from the General Counsel for USD 500 to the U.S. Department of Justice is attached as Exhibit J to this Declaration and is a true and accurate copy of this document.

14. A copy of the August 6, 2026 letter from the U.S. Department of Justice to the General Counsel for USD 500 is attached as Exhibit K to this Declaration and is a true and accurate copy of this document.

15. A copy of the August 4, 2026 letter from the General Counsel for USD 500 to the U.S. Department of Justice is attached as Exhibit L to this Declaration and is a true and accurate copy of this document.

16. A copy of the July 21, 2026 letter from the U.S. Department of Justice to USD 500 is attached as Exhibit M to this Declaration and is a true and accurate copy of this document.

17. A copy of the June 11, 2026 letter from the U.S. Department of Education to USD 500 is attached as Exhibit N to this Declaration and is a true and accurate copy of this document.

18. A copy of the April 17, 2026 letter from the U.S. Department of Education to USD 500 is attached as Exhibit O to this Declaration and is a true and accurate copy of this document.

19. A copy of the September 19, 2025 letter from USD 500 and three other school districts to the U.S. Department of Education is attached as Exhibit P to this Declaration and is a true and accurate copy of this document.

20. A copy of the September 8, 2025 letter from the U.S. Department of Education to the General Counsel for USD 500 is attached as Exhibit Q to this Declaration and is a true and accurate copy of this document.

21. A copy of the September 5, 2025 FOIA request sent to the U.S. Department of Education is attached as Exhibit R to this Declaration and is a true and accurate copy of this document.

22. A copy of the September 3, 2025 letter from the U.S. Department of Education to USD 500 is attached as Exhibit S to this Declaration and is a true and accurate copy of this document.

23. A copy of the August 29, 2025 letter from USD 500 and three other school districts to the U.S. Department of Education is attached as Exhibit T to this Declaration and is a true and accurate copy of this document.

24. A copy of the August 22, 2025 letter from the U.S. Department of Education to USD 500 is attached as Exhibit U to this Declaration and is a true and accurate copy of this

USD 500 is attached as Exhibit U to this Declaration and is a true and accurate copy of this document.

25. A copy of the August 14, 2025 letter from the U.S. Department of Education to USD 500 is attached as Exhibit V to this Declaration and is a true and accurate copy of this document.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS I HAVE PROVIDED IN THIS DECLARATION ARE TRUE AND CORRECT.

Date: 11/16/2026 D.Downing

Dawn Downing

EXHIBIT
A

KANSAS CITY KANSAS PUBLIC SCHOOLS

**Policy: JR**

**Section: J Students**

---

**Student Records**

**JR Student Records (See BCBK, CN, CNA, ECA, IDAE, JGGA, JR et seq. and KBA)**

All student records shall be treated as confidential and primarily for local school use unless otherwise stipulated. Access to student records, excluding student data submitted to or maintained in a statewide longitudinal data system in accordance with board policy IDEA, shall be permitted as set for in Board policies JR and JRB.

When records include information on more than one student, the parents/guardians of any student shall have access to copies of that part of the record that pertains to their child. Each school shall establish procedures for the granting of a request by parents/guardians for access to their child's school records within a reasonable period of time, but in no case more than 45 days after the request has been made.

In situations where the parents of a student are divorced or separated, each parent, custodial and/or non-custodial, shall have equal rights to their child's records unless a court order specifies otherwise. Private agreements between the student's parents shall not be recognized by the district's personnel.

Parents/guardians shall have an opportunity for a hearing to challenge the content of their child's school records to ensure that the records are not inaccurate, misleading or otherwise in violation of the privacy or other rights of students; to have an opportunity for the correction or deletion of any inaccurate, misleading or otherwise inappropriate data contained therein; and to insert into records the parent's/guardian's written explanation of the content of the records.

Any eligible parent/guardian or student may inspect the personal records of the student during regular school office hours. The district reserves the right to interpret selected records to students and/or parent/guardians at the time of the inspection.

When a student attains 18 years of age, the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.

The parents/guardians of students, or the students if they are 18 years of age or older shall be informed annually by the superintendent of the rights accorded them by this section and by the Family Educational Rights and Privacy Act. In addition, the public shall be informed annually by the superintendent of the categories of information the institution has determined to be directory information.

Adoption Date: **May 14, 2013**
Last Revised: **September 23, 2014**
Last Reviewed Dates: **September 18, 2014**
Policy Origin: **Approved: KASB Recommendation - 7/96; 4/07**

Attachments JR Student Records 092314.pdf

**EXHIBIT B**

KANSAS CITY KANSAS PUBLIC SCHOOLS

**Policy: JRA**

**Section: J Students**

---

**Types of Records**

**JRA <u>Types of Records</u> (See BCBK, CN, CNA, ECA, IDAE, JGGA, JR <u>et seq.</u> and KBA)**

**<u>Permanent Student Records</u>:** Each school shall permanently retain records relating to each student's academic performance, attendance and activities. Information about students collected and stored by any school personnel shall be separated into one of the following classifications:

**<u>Administrative records:</u>** official administrative records that constitute the minimum personal information necessary for operating the educational system. It shall include birth date, sex, race, names, telephone numbers, addresses and places of employment of parents, academic work completed, grades, attendance records, withdrawal and re-entry records, honors and activities, date of graduation and follow-up records of a student.

**<u>Supplementary records:</u>** verified information important in operating the educational system but is of a more sensitive nature and of less historical importance. It includes: test data, such as scores on standardized achievement, aptitude and intelligence tests; observational data such as systematically gathered teacher or counselor evaluations and observations of social and personal assets; clinical findings and verified reports of serious or recurrent deviant behavior patterns; general data such as health data, family background information and educational and vocational plans.

**<u>Tentative records:</u>** useful information that has not been verified or is not clearly needed beyond the immediate present. It includes unevaluated re-ports of teachers or counselors that may be needed in ongoing counseling or disciplinary actions.

Adoption Date: **May 14, 2013**
Last Reviewed Dates: **April 25, 2013**
Policy Origin: **Approved: KASB Recommendation - 7/96; 6/00; 4/07**

---

EXHIBIT
C

KANSAS CITY KANSAS PUBLIC SCHOOLS

**Policy: JRB**

**Section: J Students**

---

**Release of Student Records**

**JRB <u>Release of Student Records</u> (See BCBK, CN, CNA, ECA, IDAE, JGGA, JR et seq. and KBA)**

Individual student files are not available for public inspection. Except as provided in IDEA with regard to student records which are student data submitted to or maintained in a statewide longitudinal data system, the custodian of student records shall disclose the student's educational records only as provided for in this policy.

**<u>Directory Information</u>**

Annual notice shall be given to parents and eligible students concerning their rights with regard to student records. In addition, the custodian of the educational records shall give annual public notice of the class of records the institution has designated as directory information and of the right of the parent or eligible student to opt-out of the release of directory information without prior written consent. The appropriate forms for providing notice shall be on file in the office of the custodian of the educational records.

After giving notice and allowing a reasonable period of time for parents or eligible students to inform the district that any or all of the director information should not be released without prior written consent, the custodian of records may make directory information available without parental or eligible student's consent.

The custodian of records shall make student recruiting information (including student name, address, and telephone listing) available to military recruiters and postsecondary institutions unless parents or eligible students provide a written request to the district providing that the specified information not be released without prior written consent. Notice of the option to opt-out of the release of recruitment information

shall be provided to parents and eligible students in the district's annual notice of rights under the Family Educational Rights and Privacy Act.

For the purposes of this policy, school official means teacher, administrator, other certified employee or board of education. The district may disclose, without the parents or eligible students' consent, personally identifiable information to school officials with a legitimate educational interest. A school official is a person employed by the school as an administrator, supervisor, instructor, or support-staff member (including health or medical staff and law enforcement unit personnel); the school board (in executive session); a person or company with whom the school has contracted to perform a special task (such as an attorney, auditor, medical consultant, or therapist); or a parent or student serving on an official committee such as a disciplinary or grievance committee, or assisting another school official in performing his or her tasks. A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility.

The custodian may disclose students' education records to the following persons without the prior consent of the parents:

- Other school officials, including teachers within the district who have legitimate educational interests;
- Officials of other schools or school systems in which the student intends to enroll. The school district will forward student records to such institutions without further notice to the parents or eligible student;
- Authorized persons to whom a student has applied for or from whom a student has received financial aid;
- State and local officials or authorities to whom such information is specifically required to be reported or disclosed pursuant to state statutes;
- Organizations conducting studies for educational agencies for the purpose of developing, validating or administering student tests or programs;
- Accrediting organizations;
- Parents of a student 18 years of age if parents claim the student as a dependent for income tax purposes;
- Appropriate persons if knowledge of any information is necessary to protect the health or safety of the student or other persons in an emergency; and
- In compliance with a lawfully issued subpoena or judicial order.

Access will be granted to any third party upon written authorization of the eligible student, parent or guardian.

No personally identifiable information contained in personal school records shall be furnished to any person other than those, herein. When there is written instruction

from the student's parents, guardian or the eligible student specifying the records, the reasons and the person(s) to whom the release is to be made, a copy of the records to be released shall be made available to the student, parents or guardian upon request. When information is requested in compliance with a judicial order, or pursuant to any lawfully issued subpoena, parents/guardian and the student shall be notified of the orders or subpoenas in advance of compliance, with the order or subpoena unless:

- the order or subpoena specifically forbids such disclosure. or
- the order is issued in the context of a court proceeding where a parent is a party and the proceeding involves child abuse and neglect or dependency matters.

Nothing contained in this policy shall preclude authorized representatives of the Comptroller General of the United States, the Secretary and an administrative head of an educational agency or state authorities from having access to student or other records which may be necessary in connection with the audit and evaluation of federally supported education programs or the enforcement of the federal legal requirements which relate to these programs, The data collection by such official with respect to individual students shall not include information (including social security numbers) which would permit the personal identification of students or their parents or guardian on the data collected and provided.

All persons, agencies or organizations desiring access to the records of a student shall be required to sign a form, which shall be kept permanently with the student's file, but only for inspection by the parents/guardian, the student or a school official responsible for record maintenance. The form signed shall indicate the specific educational or other interest of each person, agency or organization has in seeking this information.

Personal information shall be transferred to a third party only on the condition that such party shall not permit any other party to have access to such information without the written consent of the student's parents or the eligible student. The board and staff shall protect the rights of privacy of students and their families in connection with any surveys or data-gathering activities conducted, assisted or authorized by the board or administration.

Regulations established under this policy shall include provisions controlling the use, dissemination and protection of such data.

**Forwarding Pupil Records**

Administrators shall forward student's school records upon request and may not withhold them for any reason.

Board Reviewed 04/25/2013
Board Approved 05/14/2013
Board Reviewed 09/18/2014
Board Revision Approved 09/23/2014

Board Reviewed 01/24/2017
Board Revision Approved 02/14/2017

Approved: KASB Recommendation - 7/96; 6/00; 7/02; 7/03; 4/07; 6/14; 12/16

Adoption Date: **May 14, 2013**
Last Revised: **February 14, 2017**
Last Reviewed Dates: **January 24, 2017**
Policy Origin: **Approved: KASB Recommendation - 7/96; 6/00; 7/02; 7/03; 4/07; 6/14; 12/16**

---

| | |
|---|---|
| Attachments | JRB Release of Student Records 092314.pdf<br>Policy JRB Release of Student Records 021417.pdf |

KANSAS CITY KANSAS PUBLIC SCHOOLS

**EXHIBIT D**

**Policy: JRC**

**Section: J Students**

---

**Disposition of Records**

**JRC** **Disposition of Records** (See BCBK, CN, CNA, ECA, IDAE, JGGA, JR et seq. and KBA)

All student records will be maintained and screened periodically.

Administrative records shall be permanent records and maintained by the school for an indefinite period of time. When the student graduates, supplementary records shall be destroyed or shall be transferred to the administrative records if they have permanent usefulness. Tentative records shall be destroyed when the use for which they were collected is ended. However, tentative records may be placed in the supplementary classification if the continuing usefulness of the information is demonstrated and its validity verified.

The official custodian shall review a student's records when the student moves from elementary to a middle school or junior high, from a middle school or junior high to high school and upon high school graduation. During each review obsolete or unnecessary information shall be removed and destroyed.

Following a reasonable amount of time after a student has graduated or ceases to attend school in the district, the records of the student that are determined to be appropriate for retention may be retained in a format designated by the superintendent or designee.

Adoption Date: **May 14, 2013**
Last Reviewed Dates: **April 25, 2013**
Policy Origin: **Approved: KASB Recommendation - 7/96; 4/07; 6/10**

KANSAS CITY KANSAS PUBLIC SCHOOLS

EXHIBIT
E

**Policy: JRD**

**Section: J Students**

---

**Hearing Request**

**JRD <u>Hearing Request</u> (See BCBK, CN, CNA, ECA, IDAE, JGGA, JR <u>et seq.</u> and KBA)**

When a hearing has been requested by a parent, guardian or an eligible student to challenge the content of the student's education record, the procedure to be followed in the hearing shall be:

The hearing shall be conducted and the decision rendered by a person who does not have a direct interest in the hearing outcome.

The parent, guardian or eligible student shall be given notice of the date, place and time of the hearing within a reasonable time in advance of the hearing.

The parent, guardian or the eligible student may be assisted or represented by individuals of their choice at their own expense, including an attorney. Parents, guardian or the eligible student shall be afforded a full and fair opportunity to present relevant evidence.

A written decision shall be rendered within a reasonable time after the hearing concludes. The decision of the hearing official shall be based solely upon the evidence presented at the hearing and include a summary of the evidence and the reasons for the decision.

Adoption Date: **May 14, 2013**
Last Reviewed Dates: **April 25, 2013**
Policy Origin: **Approved: KASB Recommendation- 7/96; 4/07**

---

KANSAS CITY KANSAS PUBLIC SCHOOLS

**Policy: IDAE**

EXHIBIT
F

**Section: I Instructional Program**

---

**Student Privacy Policy**

**IDAE** **Student Privacy Policy** **(See BCBK, ICA, ICAA, II and JR et seq.)**

The superintendent, the board and staff shall protect the right of privacy of students and their families in connection with any surveys or physical examinations conducted, assisted or authorized by the board or administration. The district shall annually provide parents notice of their rights under the Protection of Pupil Rights Amendment and the Student Data Privacy Act, at the beginning of each school year, and at any other time the school district policies in the area are substantially changed.

**Student Data Restrictions**

Any student data submitted to and maintained by a statewide longitudinal student data system shall only be disclosed in accordance with the Student Data Privacy Act. Disclosure of all other student data or student record information maintained is governed by the Family Educational Rights and Privacy Act ("FERPA").

Annual written notice presented to parents and legal guardians of district students shall: 1) require parent or guardian's signature; and 2) shall state student data submitted to and maintained by a statewide longitudinal data system only be disclosed as follows.

Student data may be disclosed to:

- The authorized personnel of an educational agency or the state board of regents who require disclosures to perform assigned duties; and
- The student and the parent or legal guardian of the student, provided the data pertains solely to the student.

Student data may be disclosed to authorized personnel of any state agency, or to a service provider of a state agency, educational agency, or school performing instruction, assessment, or longitudinal reporting, provided a data-sharing agreement between the educational agency and other state agency or service provider provides the following:

- purpose, scope, and duration of the data-sharing agreement;
- recipient of student data use such information solely for the purposes specified in agreement;
- recipient shall comply with data access, use, and security restrictions specifically described in agreement; and
- student data shall be destroyed when no longer necessary for purposes of the data-sharing agreement or upon expiration of the agreement, whichever occurs first.

*A service provider engaged to perform a function of instruction may be allowed to retain student transcripts as required by applicable laws and rules and regulations. Destruction shall comply with the NISTSP800-88 standards of data destruction.

Unless an adult student or parent or guardian of a minor student provides written consent to disclose personally identifiable student data, student data may only be disclosed to a governmental entity not specified above or any public or private audit and evaluation or research organization if the data is aggregate data. “Aggregate data” means data collected or reported at the group, cohort, or institutional level and which contains no personally identifiable student data.

The district may disclose:

- student directory information when necessary and the student’s parent or legal guardian has consented in writing;
- directory information to an enhancement vendor providing photography services, class ring services, yearbook publishing services, memorabilia services, or similar services;
- any information requiring disclosure pursuant to state statutes;
- student data pursuant to any lawful subpoena or court order directing such disclosure; and
- student data to a public or private postsecondary educational institution for purposes of application or admission of a student to such postsecondary educational institution with the student’s written consent.

**Student Data Security Breach**

If there is a security breach or unauthorized disclosure of student data or personally identifiable information of any student submitted to or maintained on a

statewide student longitudinal data system, each affected student or the parent or legal guardian of the student, if a minor, shall be immediately notified, and an investigation into the causes and consequences of the breach or unauthorized disclosure will be conducted.

**Biometric Data**

The district shall not collect biometric data from a student or use any device or mechanism to assess a student's physiological or emotional state, unless the adult student or the parent or legal guardian of the minor student consents in writing. "Biometric data" includes measurable biological or behavioral characteristics that can be used for automated recognition of an individual, such as fingerprints, retina and iris patterns, voiceprints, DNA sequence, facial characteristics, and handwriting.

Nothing in this policy shall prohibit the collection of audio voice recordings, facial expression information, and student handwriting for:

- provision of counseling or psychological services,
- conducting student threat assessments,
- completing student disciplinary investigations or hearings, or
- conducting child abuse investigations.

**Select Student Surveys**

No test, questionnaire, survey, or examination containing any questions about a student's or the student's parents' or guardians' personal beliefs or practices on issues such as sex, family life, morality, or religion shall be administered to any student unless:

- the parent or guardian is notified in writing; and the parent or guardian of the student gives written permission for the student to participate.

Nothing shall prohibit school counselors from providing counseling services, including the administration of tests and forms as part of student counseling services. Any information obtained through such tests or counseling services shall not be stored on any personal mobile electronic device which is not owned by the school district. Storage of such information on personal laptops, tablets, phones, flash drives, external hard drives, or virtual servers not owned by the district is prohibited.

Students may be questioned:

- in the provision of psychological services,
- conducting of student threat assessments,
- completing student disciplinary investigations or hearings, or
- conducting child abuse investigations.

Collection of such information in these limited circumstances is permitted without prior written consent of the parent, guardian, or adult student.

Board Reviewed 8/29/13
Board Approved 9/10/13
Board Reviewed 9/18/14
Board Revised 9/23/14
Board Reviewed 6/14/16
Board Approved 6/28/16

Approved: KASB Recommendation – 7/03; 6/04; 4/07; 6/14; 6/16

Adoption Date: **September 10, 2013**
Last Revised: **June 28, 2016**
Last Reviewed Dates: **July 12, 2022**
Policy Origin: **Approved: KASB Recommendation - 7/03; 6/04; 4/07; 6/14; 6/16**

---

| | |
|---|---|
| Attachments | IDAE Student Privacy Policy 092314.pdf<br>IDAE Student Privacy 062816.pdf<br>Annual Notice of Authorized Student Data Disclosures.pdf |

KANSAS CITY
KANSAS
PUBLIC SCHOOLS

**EXHIBIT**
**G**

**Policy: 20.2**

**Section: N KCKPS Police General Orders**

---

**FERPA Disclosures**

Adoption Date: **May 12, 2015**
Last Reviewed Dates: **April 28, 2015**

---

| | |
|---|---|
| Attachments | KCKPSPD - FERPA.pdf |

# KANSAS CITY KANSAS PUBLIC SCHOOLS POLICE DEPARTMENT

## GENERAL ORDER

## SUBJECT: FERPA Disclosures

ORDER NUMBER: 20.2

ISSUE DATE: May 12, 2015

EFFECTIVE DATE: May 12, 2015

REVIEW DATE: Annually on the Date of Issue

CONTENTS:

I. PURPOSE

II. DEFINITIONS AND AUTHORITY

III. POLICY

IV. DISCLOSURE AND DISSEMINATION OF INFORMATION

V. RECORDKEEPING

VI. VIOLATIONS

### I. PURPOSE

A. The Family Educational Rights and Privacy Act (FERPA) is a Federal law protecting the privacy of student Education Records.

B. The Kansas City Kansas School District Police Department (KCKPSPD) in the course and scope of its duties may gain access to student data protected by FERPA.

C. This General Order is to familiarize KCKPSPD personnel with the requirements of FERPA, and establish the policies and procedures necessary for compliance in the handling of student Education Records and Personally Identifiable Information.

### II. DEFINITIONS AND AUTHORITY

A. Biometric Record: as used in the definition of Personally Identifiable Information, means a record of one or more measurable biological or behavioral characteristics that can be used for automated recognition of an individual. Examples include fingerprints; retina and iris patterns; voiceprints; DNA sequence; facial characteristics; and handwriting. 20 U.S.C. 1232g; 34 C.F.R. §99.3.

B. Directory Information: Information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed.

1. Directory Information includes, but is not limited to: the student's name; address; telephone listing; electronic mail address; photograph; date and place of birth; major field of study; grade level; enrollment status (e.g., undergraduate or graduate, full-time or part-time); dates of attendance; participation in officially recognized activities and sports; weight and height of members of athletic teams; degrees, honors and awards received; and the most recent educational agency or institution attended.
2. Directory Information does not include a student's:
   a. Social security number; or
   b. Student identification number, except as provided in paragraph (c) of this section.
   c. Directory Information includes a student ID number, user ID, or other unique personal identifier used by the student for purposes of accessing or communicating in electronic systems, but only if the identifier cannot be used to gain access to Education Records except when used in conjunction with one or more factors that authenticate the user's identity, such as a personal identification number (PIN), password, or other factor known or possessed only by the authorized user.

34 C.F.R. §99.3; 20 U.S.C. 1232g(a)(5)(A).

C. Disciplinary Action or Proceeding: the investigation, adjudication, or imposition of sanctions by an educational agency or institution with respect to an infraction or violation of the internal rules of conduct applicable to students of that agency, or in this case district or school. 34 C.F.R. §99.3; 20 U.S.C. 1232g(b)(1).

D. Disclosure: Under FERPA, disclosure means to permit access to or the release, transfer or other communication of Personally Identifiable Information contained in Education Records to any party, by any means, including oral, written or electronic means, to any party except the party identified as the party that provided or created the record. 34 C.F.R. § 99.3; 20 U.S.C. 1232g(b)(1) and (b)(2).

E. Education Records: Under FERPA, Education Records are those that are directly related to a student and

maintained by an educational agency or institution or by a party acting for the agency or institution. Education Records do not include:

1. Records kept in sole possession of the maker, used only as a personal memory aid and are not accessible or revealed to any other person except a temporary substitute for the maker of the record.
2. Records of the Law Enforcement Unit of an educational agency or institution, subject to provisions of 34 C.F.R. §99.8.
3. Records relating to an individual who is employed by an educational agency or institution that:
   a. Are made and maintained in the normal course of business;
   b. Relate exclusively to the individual in that individual's capacity as an employee; and
   c. Are not available for any other purpose.
4. Records created or received by an educational agency after an individual is no longer a student in attendance and that are not directly related to the individual's attendance as a student.
5. Records of a student 18 years of age or older that are:
   a. Made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or para-professional acting in his or her capacity as such;
   b. Made, maintained, or used only in connection with treatment of the student; and
   c. Disclosed only to individuals providing the treatment. For purposes of this definition, treatment does not include remedial educational activities or programs that are a party of the program of instruction at the agency or institution.
6. Grades on peer-graded papers before they are collected and recorded by a teacher.

20 U.S.C. 1232g(a)(4); 34 C.F.R. § 99.3.

F. FERPA: The Family Educational Rights and Privacy Act is a Federal law protecting the privacy of student Education Records. 20 U.S.C. § 1232g; 34 CFR Part 99. FERPA generally requires a school district to have written permission from a student or their guardian before it may release information from the student's Education Records. FERPA applies only to disclosure of information obtained from Education Records.

FERPA does not apply to the disclosure of information from any other source. Once information is reported to a District or school official and becomes a record, the information in the record and the record itself becomes subject to FERPA.

G. Law Enforcement Unit: any individual, office, department, division, or other component of an educational agency or institution, such as a unit of commissioned police officers or noncommissioned security guards, that is officially authorized or designated by that agency or institution to:
1. Enforce any local, State, or Federal law, or refer to appropriate authorities a matter for enforcement of any local, State, or Federal law against any individual or organization other than the agency or institution itself; or
2. Maintain the physical security and safety of the agency or institution.

A component of an educational agency or institution does not lose its status as a Law Enforcement Unit if it also performs other, non-law enforcement functions for the agency or institution, including investigation of incidents or conduct that constitutes or leads to a disciplinary action or proceedings against the student.

20 U.S.C. 1232g(a)(4)(B)(ii); 34 C.F.R. §99.8.

H. Law Enforcement Unit Records :

1. Law Enforcement Unit Records are those records, files, documents, and other materials that are:
   a. Created by a Law Enforcement Unit;
   b. Created for a law enforcement purpose; and
   c. Maintained by the Law Enforcement Unit.

2. Records of a Law Enforcement Unit do not mean:
   a. Records created by a Law Enforcement Unit for a law enforcement purpose that are maintained by a component of the educational agency or institution other than the Law Enforcement Unit; or
   b. Records created and maintained by a Law Enforcement Unit exclusively for a non-law enforcement purpose, such as a disciplinary action or proceeding conducted by the educational agency or institution.

20 U.S.C. 1232g(a)(4)(B)(ii); 34 C.F.R. §99.8.

I. Personally Identifiable Information : Includes, but is not limited to:

1. The student's name;
2. The name of the student's parent or other family members;
3. The address of the student or student's family;

4. A personal identifier, such as the student's social security number, student number, or Biometric Record ;
5. Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;
6. Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or
7. Information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.

20 U.S.C. 1232g; 34 C.F.R. § 99.3.

## III. POLICY

A. It is the policy of this Department to comply with the requirements of FERPA.

B. KCKPSPD, as a Law Enforcement Unit, shall release its records and reports only in accordance with existing law and District policies.

C. To assure compliance, KCKPSPD personnel will use reasonable methods to identify and authenticate the identity of any party to whom Personally Identifiable Information and Education Records are disseminated.

## IV. DISCLOSURE AND DISSEMINATION OF INFORMATION

A. Law Enforcement Unit of an Educational Agency

1. FERPA allows a school or district to disclose Education Records to "school officials" who have "legitimate educational interests" in the information.
2. A school official is a person employed by the school or university in an administrative, supervisory, academic, or research, or support staff position, including Law Enforcement Unit personnel and health staff. A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility.
3. KCKPSPD is a Law Enforcement Unit whose personnel are considered school officials with legitimate educational interests under FERPA and according to KCKPS Board Policy.
4. KCKPSPD personnel must protect the privacy of Education Records that are received and may disclose them only in compliance with FERPA.
5. Accordingly, Law Enforcement Unit Records of the KCKPSPD should be maintained separately from Education Records.

B. Education Records – Under FERPA, Personally Identifiable Information from Education Records generally cannot be disclosed without a court order or consent of the student or parents of a minor student as described above. FERPA does allow disclosure and dissemination of student education record information under certain exceptions:

1. *Ex parte orders* – Personally Identifiable Information from a student's Education Records may be disclosed, without the consent or knowledge of the student or parent, to the Attorney General of the United States or to his designee.

2. *Subpoenas and court orders* – Information from a student's Education Records may be disclosed, without consent, in order to comply with a lawfully issued subpoena or court order only if reasonable effort is made to notify the student or parent if under the age of 18 of any order or subpoena in advance of compliance, so that the parent or student may seek protective action unless:
   a. Grand Jury Subpoenas – the court has ordered that the existence or contents of the subpoena, or the agency or institution's response, not be disclosed to anyone;
   b. All other subpoenas – with good cause, the issuing court has ordered that the existence or contents of the subpoena issued for a law enforcement purpose not be disclosed to anyone; or
   c. An *ex parte* order obtained by the United States Attorney General is presented.

3. *Health & Safety Emergencies* – Disclosure of protected information to any appropriate parties in connection with an emergency is permitted under FERPA if knowledge of the information is necessary to protect the health or safety of the student or other individuals.
   a. This exception is limited to specific situations that present imminent danger to a student, other students, or other members of the school community—or to a situation that requires the immediate need for information from Education Records in order to avert or diffuse serious threats to the safety or health of a student or other individual.
   b. KCKPSPD personnel shall take into account the totality of the circumstances pertaining to a threat to the health or safety of a student or other individual in making a

determination to disclose information under this exception.

c. If this determination reveals an articulable and significant threat to the health or safety of a student or other individual, information from Education Records may be disclosed to any person whose knowledge of that information is necessary to protect the health and safety of those individuals.

d. The Department of Education will not substitute its judgment for that of the party evaluating the circumstance in making its determination if, based on the information available at the time of the determination, there was a rational basis for the determination. 34 C.F.R. §99.36(c).

4. *Law Enforcement Unit Records* – FERPA permits a school or school district to contact its own Law Enforcement Unit to investigate possible violations of and to enforce any local, state, or federal law.

   a. A component of an educational agency does not lose its status as a Law Enforcement Unit if it also performs other, non-law enforcement functions for the agency, including investigation of incidents or conduct that constitutes or leads to a disciplinary action or proceeding against the student.

   b. Law Enforcement Unit Records created by the KCKPSPD in their capacity as a Law Enforcement Unit are not Education Records and are not subject to FERPA. Records created and maintained by KCKPSPD for a dual purpose (i.e., for law enforcement and disciplinary purposes) are still considered Law Enforcement Unit Records.

   c. Only those records created by the Law Enforcement Unit exclusively for a non-law enforcement purpose will not be considered records of a Law Enforcement Unit.

   d. Records protected by FERPA (i.e. Education Records or disciplinary records created by a school) and accessed or obtained by KCKPSPD personnel would still remain subject to FERPA, but may be released by KCKPSPD personnel to appropriate parties under the FERPA health or safety emergency exception. Without such an exception or one of the other enumerated exceptions, KCKPSPD personnel are not permitted to disclose Education Records to other local police authorities.

   e. KCKPSPD personnel may:

      (1). Share information gained from their own law enforcement investigation with school officials conducting a student discipline investigation, provided that information comes from KCKPSPD Law Enforcement Unit Records maintained separately from Education Records.

      (2). Share information gained from their own law enforcement investigation with outside law enforcement agencies.

      (3). Diffuse a crisis situation by arresting and detaining a student who has exhibited potentially dangerous conduct regardless of the source through which they received the information.

5. *Directory Information* – Directory Information generally does not include Personally Identifiable Information and generally may be disclosed to any interested party. Exceptions:

   a. The student or parent if over the age of 18 has exercised his/her "opt out" right to withhold any or all Directory Information ;

   b. A student ID number, or user ID, or other unique personal identifier used by a student for purposes of accessing or communicating in electronic systems may be disclosed, but only if the identifier cannot be used to gain access to Education Records when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor known or possessed only by the authorized user; and

   c. A student ID number or other unique identifier or other unique personal identifier that is displayed on a student ID badge, but only if the identifier cannot be used to gain access to Education Records when used in conjunction with one or more factors that authenticate the user's identity, such as a PIN, password, or other factor known or possessed only by the authorized user.

6. *Juvenile Records* – Disclosure to State and local officials or authorities to whom the information is specifically allowed pursuant to state statute, if the allowed reporting or disclosure concerns the juvenile justice system and the system's ability to effectively serve the student whose records are released. Such disclosure requires certification in writing by the parties to whom the records are disclosed that the information will not be disclosed to any other party.

7. *Registered sex offenders* – Disclosure is permitted if it concerns sex offenders and other individuals required to register as such under

section 170101 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. 14071, and the information was provided to the educational agency or institution under 42 U.S.C. 14071 and applicable Federal guidelines.

C. Disciplinary Actions – Student disciplinary records are generally protected as Education Records under FERPA, but there are circumstances in which disciplinary records may be disclosed without the student's consent as described in this policy.

D. Personally Identifiable Information – Before Personally Identifiable Information from an education record not meeting any of the described exceptions may be disclosed, the student or parent if under the age of 18, must have provide a signed and dated written consent.
   1. Personally Identifiable Information may be disclosed from an education record of a student without consent if the disclosure is to other school officials, including teachers, within the District who have been determined to have legitimate educational interests.
   2. Disclosure is permissible only if reasonable effort is made to notify the student or parent if under the age of 18 of any order or subpoena in advance of compliance, so that the parent or student may seek protective action.
   3. Where advance disclosure to the student or parent if under the age of 18 might jeopardize an investigation, it is suggested that the subpoena contain an order from the court that the contents of the subpoena or the information furnished in response to the subpoena not be disclosed.

## V. RECORDKEEPING REQUIRED

A. The KCKPSPD must maintain a record of each request for access to and each disclosure of Personally Identifiable Information from Education Records, as well as the names of those persons or entities that may make further disclosures of such information under the FERPA guidelines and exceptions outlined herein.

B. Such records shall be maintained so long as the Education Records of the student are maintained.

C. For each request or disclosure the record must include:
   1. The party or parties requesting or receiving the Personally Identifiable Information from the Education Records; and
   2. The legitimate interests the parties had in requesting or obtaining the information.

   A copy of such request or disclosure must be made available to the student or parent if under the age of 18 upon request.

D. The following information must be recorded when a request or disclosure of Personally Identifiable Information contained in Education Records is made under the health or safety emergency exceptions:
   1. The articulable and significant threat to the health and safety of a student or other individual that formed the basis of the disclosure; and
   2. The parties to whom the information was disclosed.

E. These recordkeeping requirements only apply to disclosure of Education Records and the information contained therein. Separately maintained Law Enforcement Unit Records may be disclosed per KCKPSPD policy and applicable law.

## VI. VIOLATIONS

A. Any suspected disclosures or information obtained in violation of FERPA should be reported immediately to the Chief of Police by the end of the business day following the receipt or disclosure of such information.

B. If it is determined that a third party outside the educational agency (or a non-school official) improperly rediscloses Personally Identifiable Information from Education Records in violation of FERPA regulations, the educational agency may not allow that third party access to Personally Identifiable Information from Education Records for at least 5 years.

C. If it is determined that compliance with FERPA for a particular piece of information is impossible in part due to a State or local law, notification must be provided to the Family Police Compliance Office, U.S. Department of Education, 400 Maryland Avenue, SW., Washington, DC 20202. Such a notification will be made only by the Chief of Police.

D. Failure to comply with the FERPA regulations contained herein may result in the termination of federal funding to the KCK Public Schools and/or the KCKPSPD.

Signed: ______________________________
Chief of Police

Date: ______________________________

# USD 500 TRANSGENDER AND GENDER NON-CONFORMING STUDENTS INTERNAL GUIDANCE DOCUMENT

1. The Kansas City, Kansas School District does not discriminate on the basis of race, color, religion, sex/gender (to include orientation, identity or expression), national origin, age, handicap, or disability, or any other basis prohibited by law in admission, access to, or treatment of its programs and activities. Transgender and gender non-conforming students are protected by the district's non-discrimination policies.

2. A student or a student's parent or legal guardian should contact the school principal if a student is transgender or gender non-conforming and the student or the student's parent or legal guardian are seeking any related accommodations. If any staff member learns a student is transgender or gender non-conforming, that information should be relayed to the school principal without delay. The school principal should discuss available accommodations and resources with the student or the student's parent or legal guardian, including the availability of a planning meeting. If it becomes known that the student does not want the student's parent or legal guardian included at this stage, that request will be evaluated on a case-by-case basis. Such requests will be evaluated by the Executive Director of Student Services & Family Support, Director of Student Support Programs, Assistant Superintendent of Organizational Development, and the district's attorney. When reviewing the request, the district will consider the student's age, the student's grade level, the student's welfare based on the information available to the district at that time, and any other relevant information.

3. Upon the request of a transgender or gender non-conforming student or that student's parent or legal guardian, the district will schedule a school planning meeting to discuss topics relevant to that student's school attendance including:

   a. Preferred name;
   b. Preferred gender;
   c. Preferred pronouns;
   d. School records/database;
   e. School support designee;
   f. Restroom and locker room use (including PE);
   g. Field trips
   h. Plans for gendered activities (e.g., sports);
   i. Additional resources
   j. Staff training plan; and
   k. Any other relevant topics.

EXHIBIT
H

4. The following individuals may be present at the school planning meeting:

   a. The student;
   b. The student's parents or legal guardian;
   c. A Student Services representative
   d. A representative of the building administration (principal or assistant principal);
   e. The building social worker or counselor;

   f. The building school psychologist;
   g. School nurse;
   h. The district Athletic Director (if applicable);
   i. The IEP case manager (if applicable); and
   j. Any other individual who might have relevant information regarding the student.

5. If the student asks to exclude the student's parent(s)/legal guardian(s) from the school planning meeting, that request will be evaluated on a case-by-case basis. Likewise, if the student does not want his or her transgender or gender non-conforming status disclosed to the student's parent(s)/legal guardian(s), that request will also be evaluated on a case-by-case basis. Such requests will be evaluated by the Executive Director of Student Services & Family Support, Director of Student Support Programs, Assistant Superintendent of Organizational Development, and the district's attorney. When reviewing the request, the district will consider the student's age, the student's grade level, the student's welfare based on the information available to the district at that time, and any other relevant information.

6. The plan developed at the school planning meeting will be reduced to writing with a copy provided to the Executive Director of Student Services & Family Support and the parent or legal guardian or the student, depending on the determination made pursuant to paragraph 5, above.

7. After the plan has been reduced to writing, an implementation meeting will be held. The date of this meeting will be agreed upon at the school planning meeting. Implementation meeting attendees will be identified at the school planning meeting and will vary. Individuals who should be considered for implementation meeting attendance include:

   a. Student Services representative;
   b. The building principal;
   c. A representative from the building's student support team (social worker/counselor/school psychologist);
   d. School support designee;
   e. Classroom teachers;
   f. School nurse;
   g. Athletic coaches; and
   h. Extracurricular sponsors.

8. Student Services will notify the Executive Director of Student Services & Family Support upon the completion of the implementation meeting.

9. Separate from any check-in's performed by the school support designee, a Student Services representative will follow up with the student or the student's parent/legal guardian, as applicable, within 30 days of implementation of the plan.

10. A follow-up school planning meeting can be held at any time at the request of the district's administration, the student, or the student's parent/legal guardian.

11. After the initial plan is implemented, an annual school planning meeting will be held to evaluate if the plan continues to meet the student's needs. Ideally, this meeting would be scheduled to ensure any plan changes can be implemented before the beginning of a new school year.

12. A copy of the plan will be maintained with the Executive Director of Student Services & Family Support, Director of Student Support Programs. Assistant Superintendent of Organizational Development and the office of the Building Principal.

**U.S. Department of Justice**

Civil Rights Division

*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530*

August 12, 2026

**EXHIBIT**
**I**

***Via Electronic Mail***
Gregory P. Goheen, Esq.
General Counsel
Unified School District No. 500, Wyandotte County, Kansas
ggoheen@mvplaw.com

**Re: Demand to Cease Violation of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and for Document Production**

Dear Mr. Goheen:

We received your August 11, 2026, letter.

In your letter, you assert that KCKPS "does not, nor has it ever, prohibited parental access to student records." FERPA's text, however, does not prohibit only policies that *deny* access. Importantly, it also explicitly prohibits any policy that "**effectively prevents**" parents from exercising their right to inspect and review their children's education records. This statutory language imposes a broader obligation than the one reflected in your letter, which is why your response continues to be insufficient.

Under 20 U.S.C. § 1232g(a)(1)(A), Congress expressly barred federal funding for any educational agency that adopts "a policy of denying, or which effectively prevents" parents from accessing education records. A policy may effectively prevent parental access even when the policy expressly permits parental access. *See*, *e.g.*, 34 C.F.R. § 99.11 (allowing a fee but prohibiting the imposition of a fee that "effectively prevents a parent . . . from exercising the right to inspect and review the student's education records"). Practical impediments—such as lack of notice, concealment, or procedures designed to exclude parents from the creation of records—render a parent unable to exercise their rights. The Transgender Guideline contains all of these impediments; they are, in fact, integral to its operation.

The Transgender Guideline's structure prevents a parent from ever knowing a record exists in the first place. A record concealed from a parent—created in meetings the parent was deliberately excluded from and retained in administrative files without parental awareness—is *de facto* inaccessible. This is a policy that "effectively prevents" parental access within the meaning of § 1232g(a)(1)(A).

Although your letter states that KCKPS is "willing to issue a statement to staff concerning FERPA that makes it clear that no USD 500 policy, guidance or practice prevents a parent from exercising any rights under FERPA," this does not resolve the underlying issue. A statement declaring compliance cannot cure a policy that, by its structure and operation, already violates FERPA's "effectively prevents" standard. Only rescinding or revising the policy can bring KCKPS into compliance.

Additionally, the Transgender Guideline violates the Protection of Pupil Rights Amendment (PPRA), 20 U.S.C. § 1232h. PPRA prohibits requiring minor students to submit to any survey, analysis, or evaluation revealing sensitive information—such as political or religious beliefs of the student's parents, mental or psychological issues, sex behavior or attitudes, or family relationships—without prior written parental consent. The planning meetings and discussions required by the Transgender Guideline involve precisely these categories. Even if KCKPS disputes these meetings are "required," a child interacting with authority figures in an evaluative setting would reasonably perceive participation as required. Under PPRA, any such discussion that elicits protected information cannot proceed without prior written consent from the student's parent.

You indicate KCKPS is willing to consider changes to the Transgender Guideline. KCKPS must either rescind the Transgender Guideline or revise it to eliminate structural barriers that effectively prevent parental access to records and ensure PPRA-required consent is obtained. Specifically, a revised policy must:

- Clarify that parental involvement is mandatory when the student is a minor child, unless a court order has limited or revoked a parent's rights;
- Notify parents when any planning meeting concerning their minor child is scheduled;
- Notify parents when any written plan, meeting notes, or other education record related to their minor child is created as a result of a planning meeting;
- Prohibit excluding parents from planning or implementation meetings that generate education records, except where FERPA expressly authorizes an exception; and
- Require prior written parental consent before any meetings or discussions that could elicit information covered by PPRA's eight protected categories.

KCKPS's continued adherence to unlawful policies constitutes an ongoing violation of federal law, and the first day of school is **Monday, August 24, 2026**. Therefore, this letter constitutes our final demand: KCKPS must either rescind the Transgender Guideline or submit a revised policy by **Wednesday, August 19, 2026**.

This is the district's last opportunity to come into voluntary compliance. Should KCKPS fail to provide an adequate response within the specified timeframe, the United States will file a civil action to enforce FERPA and PPRA's conditions and to seek all other appropriate relief.

Sincerely,

***/s/ Jordan K. Carpenter***
Jordan K. Carpenter
Counsel, Civil Rights Division
U.S. Department of Justice

mvp LAW
mvplaw.com

McAnany, Van Cleave & Phillips, P.A.
10 East Cambridge Circle Dr.
Suite 300
Kansas City, KS 66103
913.371.3838 Phone
913.371.4722 Fax

Gregory P. Goheen
Direct Line (913) 573-3325
Email: ggoheen@mvplaw.com

August 11, 2026

**EXHIBIT J**

Jordan K. Carpenter
Counsel
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington D.C.

Re: Demand to Cease Violation of Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and for Document Production

Dear Ms. Larkin:

We are in receipt of your August 6, 2026, letter. In our last correspondence, USD 500 provided you with its policies and information shared with its families concerning FERPA to include its notice to parents and eligible students of their rights to inspect and review educational records maintained by USD 500 and to request amendment to such educational records. USD 500 definitively stated that it does not, nor has it ever, prohibited parental access to student records based on a student identifying as transgender. USD 500 does not believe that any of its policies or information regarding FERPA are in violation of FERPA or its enabling regulations and you have identified no actual violations in your August 6, 2026, letter.

USD 500 disagrees with your characterization of its August 4, 2026, letter as having failed to "adequately respond" to the July 21, 2026, letter from your office or having raised any "serious concerns" about USD 500's compliance with its obligations under FERPA. Please provide us with specific examples of where you believe USD 500 did not "adequately respond" and identify each specific concern you have regarding any alleged failure by USD 500 to comply with its obligations under FERPA to include the specific provision of FERPA which you believe has not been complied with, any legal authority for your position and the factual details, to include dates, of any such alleged non-compliance. USD 500 has repeatedly requested such information and the opportunity to review and consider the same to ensure its continued compliance with FERPA by making any changes to policies, procedures and practices as may be necessary, if any.

With regard to your Request No. 1, the current version of the document titled "USD 500 Transgender and Gender Nonconforming Students Internal Guidance Document" ("Guidance Document") has been provided multiple times now during the course of this investigation including as an attachment to USD 500's August 4, 2026, letter. Nonetheless, another copy is attached hereto. This current version of the Guidance Document has been in use since 2024.

With regard to your Request No. 2(a), you have asked USD 500 to "explain the relevance of a student's age in evaluating the student's request to exclude his or her parents from a discussion about available accommodations and resources based on the student's transgender or gender non-conforming status, including the availability of a planning meeting", can you explain what this request has to do with FERPA and cite to the provision of FERPA which you believe is at issue?

Regardless of whether FERPA is at issue or not and as previously explained in USD 500's August 4, 2026, letter, an individual who is 18 years of age or older is no longer considered to be a minor under Kansas law (even if the individual is still enrolled as a student in a K-12 public school district) absent a disability or other extenuating circumstance. This makes the student's age a relevant consideration in the circumstance where a student indicates that the student does not want the student's parents involved in the discussion of available accommodations and resources under the Guidance Document.

With regard to your Request No. 2(b), "other relevant information" that could be considered depends on the specific circumstances of each case. It is not possible, practical or prudent to provide guidance that does not allow for consideration of information that might not be thought of in advance that could impact the determination of how to deal with a particular student's request. An example of "other relevant information" might include whether a student has any disability or special need that impacts the student's cognitive ability to make independent decisions or where a guardian *ad litem* has been appointed by a court for the student.

With regard to your Request No. 3(a), the answer is the same as it is for your Request No. 2(a).

With regard to your Request No. 3(b), the answer is the same as it is for your Request No. 2(b).

With regard to your Request No. 4, the answer is none.

With regard to the demands set forth in the final paragraph of your letter, USD 500 has provided all of its policies to you concerning educational records under FERPA and you have provided no additional information as to what you believe needs to be revised in the Guidance Document or why. Again, USD 500 is willing to consider any specific suggestions you may have to address whatever specific concerns regarding the Guidance Document related to FERPA that you may have. USD 500 remains willing to issue a statement to staff concerning FERPA that makes it clear that no USD 500 policy, guidance or practice prevents a parent from exercising any rights under FERPA to their student's educational records or information based on the student's gender identity or otherwise.

USD 500 remains committed to continued compliance with FERPA and continues to request guidance and support from SPPO to ensure that its policies, procedures and practices remain compliant. It would be nice if you or SPPO could provide guidance and support for the school district by identifying specific language, if any, in USD 500's policies or in the Guidance Document which you believe violate FERPA together with citations to the provisions of FERPA that you contend are applicable and suggested language changes for USD 500 to consider instead of continuing to threaten litigation or loss of federal funding.

Best regards,

*/s/ Gregory P. Goheen*

Gregory P. Goheen
GPG/klb

**U.S. Department of Justice**

Civil Rights Division

*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530*

August 6, 2026

**EXHIBIT K**

***Via Electronic Mail***
Gregory P. Goheen, Esq.
General Counsel
Unified School District No. 500, Wyandotte County, Kansas
ggoheen@mvplaw.com

**Re: Demand to Cease Violation of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and for Document Production**

Dear Mr. Goheen:

We are in receipt of your letter dated August 4, 2026. Your letter fails to adequately respond to the United States' demand and raises serious concerns regarding KCKPS's compliance with its obligations under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g. Please provide the information requested below to clarify:

1. Please provide a copy of the **current** version of "USD 500 Transgender and Gender Non-conforming Students Internal Guidance Document" ("Transgender Guideline"). Please also provide any document showing when that version was adopted.

2. In each version of the Transgender Guideline you provided, the following appears in the second numbered paragraph:

   > When reviewing the [student's] request [to exclude the student's parents from a discussion about available accommodations and resources based on the student's transgender or gender non-conforming status, including the availability of a planning meeting], the district will consider the student's age, the student's grade level, the student's welfare based on the information available to the district at that time, and any other relevant information.

   a. Please explain the relevance of a student's age in evaluating the student's request to exclude his or her parents[1] from a discussion about available accommodations and resources based on the student's transgender or gender non-conforming status, including the availability of a planning meeting.

   b. Please explain what the school has considered "other relevant information" when evaluating a student's request to exclude his or her parents from a discussion about

[1] Throughout this letter, the United States uses "parent" to mean a natural parent, a guardian, or an individual acting as a parent in the absence of a parent or a guardian. 34 C.F.R. § 99.3.

available accommodations and resources based on the student's transgender or gender non-conforming status, including the availability of a planning meeting.

3. In each version of the Transgender Guideline you provided, the following appears as the fifth numbered paragraph:

> If the student asks to exclude the student's parent(s)/legal guardian(s) from the school planning meeting, that request will be evaluated on a case-by-case basis. Likewise, if the student does not want his or her transgender or gender non-conforming status disclosed to the student's parent(s)/legal guardian(s), that request will also be evaluated on a case-by-case basis. Such requests will be evaluated by the [Executive Director of Student Services & Family Support, Director of Student Support Programs, Executive Director of Equity & Inclusion, and the district's attorney] [OR] [Chief of Staff, the Executive Director of Federal Programs, the Director of Student Services, and the district's attorney]. When reviewing the request, the district will consider the student's age, the student's grade level, the student's welfare based on the information available to the district at that time, and any other relevant information.[2]

   a. Please explain the relevance of a student's age in evaluating the student's request to exclude his or her parents from the school planning meeting or to prevent disclosure to the student's parents of "his or her transgender or gender non-conforming status."

   b. Please explain what the school has considered "other relevant information" when evaluating a student's request to exclude his or her parents from the school planning meeting or to prevent disclosure to the student's parents of "his or her transgender or gender non-conforming status."

4. Please provide copies of other internal guidance documents that direct or allow for case-by-case determinations to be made about parental involvement that do not involve the status of "transgender and gender non-conforming students."

To address the United States' concerns, within five (5) calendar days of the date of this letter, KCKPS must (1) provide the information or documents requested above; (2) rescind or substantially revise—submitted to the Department for review—"USD 500 Transgender and Gender Non-conforming Student Internal Guidance Document" to ensure parents receive full access to their children's education records, including all information related to a student's transgender status, gender identity, sexual orientation, preferred name, or preferred pronouns; and (3) issue a written directive to all KCKPS staff clarifying that no policy, guideline, or practice may prevent parents from accessing or being given information about any portion of their children's education records, including records containing information about transgender status, gender identity, sexual orientation, preferred name, or preferred pronouns. A further response consisting of relabeling or definitional maneuvering will not satisfy this request. The United States will treat such a response as an indication that voluntary compliance is not possible.

---

[2] Bracketed language reflects differing text in two versions of the Transgender Guideline provided to the United States.

Should KCKPS fail to provide an adequate response within the 5-day timeframe, the United States will file a civil action to enforce FERPA's conditions and to seek all other appropriate relief.

Sincerely,

***/s/ Jordan K. Carpenter***
Jordan K. Carpenter
Counsel, Civil Rights Division
U.S. Department of Justice

KANSAS CITY KANSAS PUBLIC SCHOOLS

August 4, 2026

Harmeet K. Dhillon
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington D.C.

EXHIBIT
L

Ryan A. Kriegshauser
United States Attorney
District of Kansas
U.S. Department of Justice

RE: Demand to Cease Violation of Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and for Document Production

I am general counsel for Unified School District No. 500, Wyandotte County, Kansas ("USD 500") and your letter dated July 21, 2026, has been provided to me for response.

In your letter, you request that USD 500 "cease its ongoing substantial noncompliance with the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g" and threaten litigation if USD 500 does not agree to certain outlined conditions.

At the outset, USD 500 disagrees with your assertion that there has been any "ongoing substantial noncompliance" with FERPA and has no desire or intention to violate FERPA in any manner. USD 500 is a unified school district and governmental subdivision of the State of Kansas, duly organized and existing pursuant to Article 6, § 5 of the Constitution of the State of Kansas and K.S.A. 72-1131, et seq. Like any other Kansas unified school district, USD 500 is governed by its locally elected board of education, which is subject to and in compliance with any applicable federal or state law or regulation, transacts all school district business and adopts such policies as it deems appropriate to perform its constitutional duty to maintain, develop and operate the local public schools within its boundaries. As has been previously communicated, USD 500 has adopted policy to ensure compliance with FERPA, specifically, Board Policy JR (Student Records), JRA (Types of Records), JRB (Release of Student Records), JRC (Disposition of Records), JRD (Hearing Request), IDAE (Student Privacy Policy) and N Police General Order 20.2 (FERPA Disclosures). Those policies, which are based on model policies developed by the Kansas Association of School Boards utilized by most Kansas school districts, are publicly available on USD 500's website, respectively at:

https://kckps.community.highbond.com/home/policies/policydoc/c40f83b2-e48e-4901-9a87-3a9812fe9cb1
https://kckps.community.highbond.com/home/policies/policydoc/4afa948f-1524-4576-8bd2-

f9b91811939f

https://kckps.community.highbond.com/home/policies/policydoc/de08d643-6ed2-428b-9733-bad92109de77
https://kckps.community.highbond.com/home/policies/policydoc/de8c8f86-8741-4b71-8eee-7783f7d792f4
https://kckps.community.highbond.com/home/policies/policydoc/28e44a55-cfc4-430f-91bf-f9eef695b971
https://kckps.community.highbond.com/home/policies/policydoc/d4b8a9ac-6e6e-4601-a28d-54091ae3b417
https://kckps.community.highbond.com/document/35297bed-b6ab-4b5b-9f50-74621b901097/

Additionally, information on FERPA is shared with families in the Parent Student Handbook, Annual Notice to Parents Authorized Student Date Disclosures, Family Educational Rights Privacy Act (FERPA), Media Waiver/Internet Publishing and Parents' Right to Know – all on the school district's website:

https://www.kckschools.org/families-students/parent-student-handbook
https://www.kckschools.org/families-students/privacy-information-for-parents-and-students

As previously stated and set forth in these policies, USD 500 complies with FERPA, including specifically, parents' and eligible students' right to inspect and review their education records and parents' and eligible students' right to request that their education records be amended. USD 500 does not respond to requests to inspect or access education records of students in attendance at USD 500 differently for any parent, including parents of transgender students. Stated more plainly, USD 500 does not, nor has it ever, prohibited parental access to student records based on a student identifying as transgender.

As stated in prior correspondence, USD 500 has not been notified of any parent complaint alleging failure to provide access to education records (or failure to comply with any other parent right afforded under FERPA) that has been filed with the SPPO or any other entity in connection with this investigation. Nor has USD 500 received any substantive response to its September 5, 2025, Freedom of Information Act Request ("FOIA") which it submitted at the direction of the Student Privacy Policy Office ("SPPO") shortly after this investigation was initiated.

USD 500 does not believe that any of its policies or information regarding FERPA are in violation of, or are even alleged by you to be in violation of, FERPA or its enabling regulations. However, if there are any concerns, please advise and provide us with those concerns with citation to authority and any proposed changes so that USD 500 can consider the same and make any changes as necessary to ensure its continued compliance with FERPA.

In your letter, you make reference to a "Transgender Guideline" and "employee practices" which you contend violate FERPA by imposing a "categorical prohibition on disclosure of that

information [about student's transgender status, gender identity, sexual orientation, preferred name, pronouns, or related matters] to parents absent student authorization renders parents' right[s] to inspect and review those records meaningless. To be clear, USD 500 does not have, nor has it ever had, a "Transgender Guideline" that categorically prohibits disclose of a student's educational records or other information about a student's gender identity or other related matters referenced in your letter absent the student's authorization or consent. As previously stated by USD 500 on numerous occasions, the only guideline concerning transgender students ever utilized by USD 500 is the "USD 500 Transgender and Gender Non-conforming Student Internal Guidance Document" which has been previously provided in connection with SPPO's investigation. This Guidance Document, which is attached again for your reference, was created to help school district staff navigate parental and student requests in situations where the student is identifying as transgender. Contrary to the narrative being presented, USD 500 fully and completely complies with FERPA and nothing in the Guidance Document prohibits or limits a parent's access to their child's educational records based a student's expressed desire to not share information about the student's gender identity. Instead, the Guidance Document fully anticipates the participation of a student's parents in seeking to support a transgender or gender non-conforming student's needs within the school environment.

Although not specifically related to a student's educational records, the Guidance Document, in paragraph nos. 2 & 5 does try to provide guidance for how to navigate situations where a student does not want the student's parent or legal guardian included so that administrators and other staff are equipped to deal with those situations should they arise. Basically, if this situation occurs, the Guidance provides for the student's request to be elevated from the building principal to the upper level of the school district administration, to include legal counsel, to review and make a case-by-case determination on how to proceed. As you are no doubt aware, there are very few limited circumstances where a school district might, depending on the circumstances, not be able to notify the student's parents, such as: where the student is 18 years old and no longer a minor; where the student has been emancipated; where parental rights have been terminated or otherwise limited by a judicial order; where there is an active law enforcement or Kansas Department for Children and Families ("DCF") investigation into abuse or neglect by the parent; or where there is reason to suspect abuse or neglect by the parent mandating a referral to DCF. These situations do not depend on the student's gender identity but are premised on other factors that potentially trigger other statutory or regulatory obligations of the school district which requires a case-by-case review. See e.g., 20 U.S.C. § 1232g(d), 34 CFR Sec. 99.3 & 99.5 ("Whenever a student has attained eighteen years of age, …, the permission or consent required of, and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.").

Of note, this Guidance Document is not the document linked to SPPO's August 14, 2025, letter to USD 500 labeled as "Kansas City Kansas Public Schools Guidelines for Transgender and General Non-Conforming Students at School." As has been communicated repeatedly to SPPO and others, the document linked to that letter is not and has never been adopted, approved or utilized by USD 500. Rather, that document was included in a presentation made to USD 500's board of education during an open public meeting on September 18, 2017. At the meeting (as

reflected in the publicly available minutes), the board of education accepted the report as an information item only and did not and has not ever adopted or approved the referenced "Guidelines for Transgender and Gender Non-Conforming Students at School". This document is only accessible on USD 500's website through BoardDocs, because the document was presented to the board at that meeting and, therefore, is required to remain part of the board's public records.

As for the allegations concerning employee practices and your reference to a recording or recordings, USD 500 does not have copies of or access to such recordings other than having seen what appears to be an edited version that has appeared on-line that appears out-of-context and incomplete. If you have a complete copy of these recordings, I would ask that you provide copies of the same so that the issues raised concerning them can be fully addressed. Regardless, USD 500 does not have, nor has it ever had, any practice of withholding educational records of students from parents.

With regard to your specific demands to avoid litigation, USD 500 responds as follows:

1. Cease all enforcement of the Transgender Guideline (and any related regulations, guidelines, or practices) that prohibit or restrict the disclosure of information concerning a student's transgender status, gender identity, sexual orientation, preferred name, or preferred pronouns to the student's parents or guardians.

As discussed above, if you are referring to the document linked to SPPO's August 14, 2025, letter to USD 500 labeled as "Kansas City Kansas Public Schools Guidelines for Transgender and General Non-Conforming Students at School" that document has never been in force or effect and, therefore, there is nothing to cease. If, instead, you are referring to the attached internal guidance titled "USD 500 Transgender and Gender Non-conforming Student Internal Guidance Document" nothing in this document prohibits or restricts a parent or guardian's rights under FERPA or the disclosure of the information you have identified based on the student's gender identity. Again, there is nothing to cease that would violate FERPA. If you have suggested changes to this Guidance Document, please advise and provide us with any proposed changes and citation to authority so that USD 500 can consider the same and make any changes as necessary to ensure its continued compliance with FERPA. It remains USD 500's desire to continue to fully comply with FERPA in all respects and appreciates any guidance and support you can provide.

2. Evaluate all KCKCPS policies, guidelines, and practices to ensure they protect and promote parents' rights under FERPA, including the right to inspect and review their children's education records in full, without restriction based on the content of those records.

As discussed above, USD 500 does not believe that any of its policies or information regarding FERPA are in violation of, or are even actually alleged by you to be in violation of, FERPA or its enabling regulations. However, if there are any concerns with any of USD 500's policies or

information regarding FERPA, please advise and provide us with any proposed changes and citation to authority so that USD 500 can consider the same and make any changes as necessary to ensure its continued compliance with FERPA. Again, it remains USD 500's desire to continue to fully comply with FERPA in all respects and appreciates any guidance and support you can provide.

3. Issue a written directive to all KCKPS staff clarifying that no policy, guideline, or practice may prevent parents from accessing or being given information about any portion of their children's education records, including records containing information about transgender status, gender identity, sexual orientation, preferred name, or preferred pronouns.

USD 500 is willing to issue a statement to staff concerning FERPA that makes it clear that no USD 500 policy, guideline or practice prevents a parent from exercising any rights under FERPA to educational records or information of their student based on the student's gender identity or otherwise.

4. Provide written confirmation to me, signed by the Superintendent of Schools and Board President, that KCKPS has completed the actions set forth in paragraphs 1-3 above.

The Superintendent and Board President have signed this letter. Again, with respect to the requested items in paragraph nos. 1-3 above, USD 500 is open to making any suggested changes to "USD 500 Transgender and Gender Non-conforming Student Internal Guidance Document" and to its policies or other information as may be necessary for continued compliance with FERPA.

5. Produce any versions of the Transgender Guideline that have been in place since 2017.

Copies of the versions of "USD 500 Transgender and Gender Non-conforming Student Internal Guidance Document" are provided.

USD 500 is hopeful that this will bring this matter to an end. If you have any questions or would like to discuss, please do not hesitate to contact me.

Best regards,

Gregory P. Goheen

Dr. Anna Stubblefield
Superintendent of Schools

Randy Lopez
President of the Board of Education

**U.S. Department of Justice**

Civil Rights Division

*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530*

July 21, 2026

**EXHIBIT**
**M**

*Via U.S. Mail & Electronic Mail*
Kansas City, Kansas Public Schools
Board of Education and Superintendent
2010 N. 59th Street
Kansas City, KS 66104
Anna.Stubblefield@kckps.org
Dawn.Downing@kckps.org

**Re: Demand to Cease Violation of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and for Document Production**

Dear Members of the Board and Superintendent Stubblefield:

We write to demand that Kansas City, Kansas Public Schools ("KCKPS") immediately cease its ongoing, substantial noncompliance with the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g. Pursuant to 20 U.S.C. § 1234c(a), and consistent with the authority vested in the United States to enforce the conditions of federal education funding, the Department of Education has partnered with the Department of Justice to initiate enforcement proceedings.

We are aware of a recording that reveals Dr. Canise Salinas, KCKPS Assistant Superintendent of Organizational Development, referring to a "transgender guideline," which another unidentified person refers to as a "document" (the "Transgender Guideline"). Dr. Salinas asserts that the Transgender Guideline is not made available to the school community but is instead safeguarded by certain "gatekeepers." Additional recordings reveal (1) Dr. Salinas discussing secret policies, conversations, and other non-specified efforts that are deliberately hidden from public view; and (2) Lauren Hernandez, KCKPS Organizational Development Specialist, discussing her willingness to obscure information from a student's father based on the father's religious affiliation.

Congress conditions the provision of federal funds to educational agencies and institutions upon their agreement not to adopt or maintain "a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children." 20 U.S.C. § 1232g(a)(1). KCKPS is a recipient of such federal funds and is bound by this statutory requirement.

The Transgender Guideline and KCKPS employee practices appear to directly violate the conditions Congress placed on the receipt of federal funds. These actions by KCKPS create and enforce a policy that denies or effectively prevents parents from exercising their statutory right to inspect and review their children's education records. Under FERPA, "education records" includes any record, note, email, or other document maintained by KCKPS that contains information about a student's

transgender status, gender identity, sexual orientation, preferred name, pronouns, or related matters. A categorical prohibition on disclosure of that information to parents absent student authorization renders parents' right to inspect and review those records meaningless. Worse, a coordinated, secret campaign waged by school administrators to bypass the requirements of the law reveals outright hostility to the rights FERPA protects.

To avoid litigation, KCKPS must take the following actions no later than fourteen (14) days from the date of this letter:

1. Cease all enforcement of the Transgender Guideline (and any related regulations, guidelines, or practices) that prohibit or restrict the disclosure of information concerning a student's transgender status, gender identity, sexual orientation, preferred name, or preferred pronouns to the student's parents or guardians.

2. Evaluate all KCKPS policies, guidelines, and practices to ensure they protect and promote parents' rights under FERPA, including the right to inspect and review their children's education records in full, without restriction based on the content of those records.

3. Issue a written directive to all KCKPS staff clarifying that no policy, guideline, or practice may prevent parents from accessing or being given information about any portion of their children's education records, including records containing information about transgender status, gender identity, sexual orientation, preferred name, or preferred pronouns.

4. Provide written confirmation to me, signed by the Superintendent of Schools and Board President, that KCKPS has completed the actions set forth in paragraphs 1-3 above.

5. Produce any versions of the Transgender Guideline that have been in place since 2017.

If KCKPS fails to comply in a timely manner with this demand, the United States will file a civil action to enforce FERPA's conditions and to seek all other appropriate relief.

This letter constitutes a formal demand and a final opportunity to cure before litigation may be initiated. We urge KCKPS to act promptly to ensure full compliance with federal law. Please direct all written correspondence and confirmations to Jordan.Carpenter2@usdoj.gov.

Sincerely,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

Ryan A. Kriegshauser
United States Attorney
District of Kansas
U.S. Department of Justice

Cc: The Honorable Kris Kobach, Attorney General of Kansas

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

June 11, 2026

Dr. Anna Stubblefield
Superintendent of Schools
Kansas City Kansas Public Schools, USD 500
2010 N. 59th Street
Kansas City, KS 66104
c/o Greg Goheen, Legal Counsel

EXHIBIT
N

Sent via email only, to: ggoheen@mvplaw.com

Re: Impasse Letter - OCR Case No. 07251501
Kansas City Kansas Public Schools, USD 500

Dear Dr. Stubblefield:

On April 17, 2026, the U.S. Department of Education (Department), Office for Civil Rights (OCR) and Student Privacy Policy Office (SPPO) issued a Letter of Findings of Non-Compliance and Proposed Resolution Agreement for the complaints referenced above. OCR investigated whether Kansas City Kansas Public Schools, USD 500 (District) policy denies female students access to female-only intimate facilities, such as sex-separated locker rooms and restrooms, and permits male students to participate in female athletics programs, in violation of Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulation, at 34 C.F.R. Part 106.

Based on a review of publicly available information, District policy and guidance documents, athletic program information, and internal and external communications, OCR determined that the District is not in compliance with Title IX and its implementing regulations with regard to the District's policies and practices applicable to restrooms, locker rooms and changing facilities which allow males to use girls' locker rooms and bathrooms based on their "gender identity." In addition, OCR determined that, during the investigation, the District intentionally failed to provide the Department with access to sources of information for the Department to make a full compliance determination regarding Title IX and its implementing regulations.

The Title IX regulation, at 34 C.F.R. § 106.3, requires recipients found to be in violation of Title IX, to take remedial action to resolve all violation findings.

In accordance with the Title IX regulatory procedures for bringing recipients into compliance, OCR provided the District a Proposed Resolution Agreement concurrently with the Letter of Finding of Non-Compliance. The Proposed Resolution Agreement specified the actions that the District must take to voluntarily come into compliance with Title IX and remedy the District's

Title IX violations.

On April 23, 2026, OCR contacted the District and inquired if the District was interested in discussing the Proposed Resolution Agreement. On May 1, 2026, OCR provided the District with the direct email and phone number for the current OCR contact for this complaint. On May 28, 2026, OCR again contacted the District and inquired if the District wanted to discuss the Proposed Resolution Agreement. To date, the District has provided no response to OCR's outreach.

Since the District has not responded to OCR's proposed Resolution Agreement, OCR is issuing this Impasse Letter to inform the District that a Letter of Impending Enforcement Action will be issued 10 calendar days from today's date unless the District reaches an agreement with OCR and executes an OCR-approved Resolution Agreement within that 10-day period.[1] If no Resolution Agreement has been executed by **close of business on June 22, 2026**, OCR will issue a Letter of Impending Enforcement Action to the District.

If you have any questions regarding this letter or to initiate resolution discussions, please contact me at Jennifer.Brooks@ed.gov.

Respectfully,

Jennifer Brooks
Acting Regional Director

---

[1] See, OCR Case Processing Manual, Section 303(g).

UNITED STATES DEPARTMENT OF EDUCATION

April 17, 2026

**EXHIBIT O**

Dr. Anna Stubblefield
Superintendent of Schools
Kansas City Kansas Public Schools, USD 500
2010 N. 59th Street
Kansas City, KS 66104
c/o Greg Goheen, Legal Counsel

Sent via email only, to: ggoheen@mvplaw.com

Re: Letter of Findings – Notice of Noncompliance with Title IX and FERPA
Kansas City Kansas Public Schools, USD 500
OCR Case No. 07251501; SPPO Case No. 25-0738

Dear Dr. Stubblefield:

This letter is to inform you of the outcome of the investigation conducted by the U.S. Department of Education (Department), Office for Civil Rights (OCR) and Student Privacy Policy Office (SPPO), of the Kansas City Kansas Public Schools, USD 500 (the District), referenced above.

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq*., and its implementing regulation, 34 C.F.R. Part 106,[1] which prohibit discrimination on the basis of sex in any education program or activity receiving federal financial assistance. As a recipient of Federal financial assistance from the Department, the District is subject to Title IX and to OCR's enforcement jurisdiction.

The SPPO enforces the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and it's implementing regulation at 34 C.F.R. Part 99. Pursuant to its regulatory authority, as set forth in 20 U.S.C. §1232g(f), 34 C.F.R. § 99.60, 34 CFR §§ 99.64 and 99.65, SPPO may investigate complaints and take appropriate action to enforce FERPA.

All federal funding recipients from the Department are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders issued by the President of the United States. 34 C.F.R. §§ 75.500 and 75.700.

OCR investigated whether Kansas City Kansas Public Schools, USD 500 policy or practice denies female students the equal benefits of any education program or activity by denying females access to female-only intimate facilities, such as sex-separated locker rooms and bathrooms in violation of Title IX and its implementing regulations.[2] OCR also investigated whether Kansas City Kansas Public Schools, USD 500, policy or practice permits male students to participate in interscholastic and intramural athletic programs designated for female students, in violation of

[1] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).
[2] The terms "bathrooms" and "restrooms" are used interchangeably throughout this letter.

Title IX and its implementing regulations. In addition, SPPO investigated whether the Kansas City Kansas Public Schools, USD 500, has a policy that interferes with the right of parents to inspect and review their minor children's education records in violation of FERPA and its implementing regulations.

In accordance with OCR's Case Processing Manual (February 19, 2025), OCR has reached its determination by using a preponderance-of-the-evidence standard, and finds that the evidence supports a conclusion of noncompliance with Title IX.

Kansas City Kansas Public Schools, USD 500, has a policy that allows males to use girls' locker rooms and bathrooms, and to compete in interscholastic athletics based on their "gender identity." The District has done so despite being informed such policies and practices violate Title IX, and result in harms that are the obvious result of such policies. Thus, Kansas City Kansas Public Schools, USD 500, is in clear violation of Title IX.

Also, as further explained below, the Kansas City Kansas Public Schools, USD 500, intentionally failed to provide the Department with access to sources of information to determine the District's compliance with Title IX and FERPA during the investigation, in violation of 34 C.F.R. §§ 99.6, 100.6, 106.4, and 106.81.

Title IX's prohibition of discrimination on the basis of sex does not include "gender identity" or "gender-identity discrimination." "Sex," as used by Title IX, does not mean, and has never meant, "gender identity." Title IX and its implementing regulations have never used or defined the term "gender identity." When recipients of federal funding treat males who identify as females as if they are biological females, they defeat the very purpose of Title IX: to ensure equal opportunities for women and girls. Allowing males to invade intimate female-only facilities like locker rooms or bathrooms endangers the safety, privacy, and dignity, of women and girls while denying them equal access to educational activities or programs. Policies and/or practices that allow males to compete in women's sports is demeaning, unfair, dangerous to women, and denies women the same equal opportunity to participate and excel in competitive sports afforded to men.

For the reasons explained below, SPPO finds the District is also in violation of FERPA as alleged.

# I. Legal Standards

## A. Title IX Statutory and Regulatory Background

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).[3]

---

[3] Title IX defines "recipient" as "any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof." 34 C.F.R. § 106.2(i). Title IX defines "educational institution" to include "any public elementary, or secondary school.

After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The Department has exercised this authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletic programs, among other things. *See* 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975). The general prohibition against sex discrimination appears at 34 C.F.R. § 106.31(a). Some specific applications appear at 34 C.F.R. § 106.31(b).

Regarding intimate facilities, the regulations require parity: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

And with regard to athletics, the regulations first state a general prohibition against sex-segregation:

> (a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a). The regulations then state two exceptions:

> (b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is [1] based upon *competitive skill* or [2] the activity involved is a *contact sport*. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is

---

. ." 20 U.S.C. § 1681(c). Similarly, 34 C.F.R. § 106.2(k) defines "educational institution" to include "a local educational agency (LEA)." "Local educational agency or LEA means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 34 C.F.R. § 303.23. Title IX defines "program or activity" to include "all the operations of . . . a local educational agency . . . other school system." 20 U.S.C. § 1687; *see also* 34 C.F.R. § 106.2(h).

> a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

34 C.F.R. § 106.41(b) (emphasis added). Further, notwithstanding the general prohibition against sex segregation or the two exceptions in which sex-segregation is permitted, the regulations require that members of both sexes be afforded equal athletic opportunity:

> (c) Equal Opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
> > (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> >
> > (2) The provision of equipment and supplies;
> >
> > (3) Scheduling of games and practice time;
> >
> > (4) Travel and per diem allowance;
> >
> > (5) Opportunity to receive coaching and academic tutoring;
> >
> > (6) Assignment and compensation of coaches and tutors;
> >
> > (7) Provision of locker rooms, practice and competitive facilities;
> >
> > (8) Provision of medical and training facilities and services;
> >
> > (9) Provision of housing and dining facilities and services;
> >
> > (10) Publicity.
>
> Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

34 C.F.R. § 106.41(c).

The regulations also address separation of students by sex in physical education classes:

> > Contact sports in physical education classes. This section does not prohibit separation of students by sex within physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball, and other sports the purpose or major activity of which involves bodily contact.
> >
> > . . .

> Classes or portions of classes in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for boys and girls.

34 C.F.R. § 106.34. The regulation further provides that if recipient provides classes or activities separated by sex, they must be separated by sex, not gender identity, and they must be equally offered to both sexes.

For education benefits and services not provided directly by a recipient, the regulation requires:

> (d) Aid, benefits or services not provided by recipient.
>
> > (1) This paragraph applies to any recipient which requires participation by any applicant, student, or employee in any education program or activity not operated wholly by such recipient, or which facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient, including participation in educational consortia and cooperative employment and student-teaching assignments.
> >
> > (2) Such recipient:
> >
> > (i) Shall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any applicant, student, or employee of such recipient which this part would prohibit such recipient from taking; and
> >
> > (ii) Shall not facilitate, require, permit, or consider such participation if such action occurs.

34 C.F.R. § 106.31(d).

### B. FERPA Statutory and Regulatory Background

FERPA provides that parents have the right to inspect and review their children's education records, which are defined as records, files, documents, and other materials that are directly related to a student and maintained by an educational agency or institution, or by a party acting for the agency or institution. 20 U.S.C. § 1232g(a)(l)(A); 34 CFR Part 99, Subpart B, and § 99.3 ("Education records"). Once a student reaches 18 years of age or attends a postsecondary institution, all FERPA rights transfer from parents to the student. 34 CFR §§ 99.3 ("Eligible student") and 99.5. For this investigation, we assume that the students in question are not "eligible students" and that the parents retain their right to inspect and review their children's education records under FERPA. Recipients of Federal financial assistance from the Department are subject to these laws and regulations and to the Secretary's enforcement authority.

Congress passed the Family Educational Rights and Privacy Act in 1974 "to assure parents of students access to their educational records." *Frazier v. Fairhaven Sch. Comm*, 276 F.3d 52, 67 (1st Cir. 2002) (alteration and citation omitted); *see also Manco v. St. Joseph's Univ.*, 350 F.R.D. 62, 68 (E.D. Pa. 2025) (noting that FERPA was enacted "for the purpose of ensuring parents' access to their children's educational records"). FERPA achieves that goal through conditioning Federal funding on certain requirements. In particular, no funds shall be made available under any

applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children. 20 U.S.C. § 1232g(a)(1)(A). FERPA also requires educational agencies and institutions to "effectively inform[] the parents of students … of the rights accorded them by this section." *Id.* § 1232g(e).

FERPA defines "education records" as, with certain narrow exceptions, "those records, documents, and other materials which[] contain information directly related to a student," and "are maintained by an educational agency or institution or by a person acting for such agency or institution." *Id.* § 1232g(a)(4)(A); *accord* 34 C.F.R. § 99.3(a); *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 429 (2002). The "plain meaning" of this provision "reveals that Congress intended for the definition to be broad in scope." *Belanger v. Nashua Sch. Dist.*, 856 F. Supp. 40, 48 (D.N.H. 1994). In other words, "Congress made no content-based judgments with regard to its 'education records' definition." *United States v. Miami Univ.*, 294 F.3d 797, 812 (6th Cir. 2002). For that reason, "FERPA does not exempt from its disclosure obligation education records that deal with preferred names and pronouns." *Ricard v. USD 475 Geary Cnty.*, 2022 WL 1471372, at *7 (D. Kan. May 9, 2022).

FERPA provides that the Secretary of Education "shall take appropriate actions to enforce this section and to deal with violations of this section, in accordance with this Act." 20 U.S.C.. § 1232g(f). The Act authorizes the Secretary to "terminate assistance" when she "finds there has been a failure to comply with this section" and she "has determined that compliance cannot be secured by voluntary means." *Id.*

### C. Title IX Prohibits Discrimination Based on "Sex," Not "Gender Identity"

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The term "sex" is both objective and binary. As used in Title IX, it does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex). What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations . . . reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See, e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of *one sex* shall be comparable to such facilities

provided to students of *the other sex*") (emphasis added); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and not influenced by subjective perceptions of one's own "gender." *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

Consistent with "sex" meaning biological sex in Title IX, on January 20, 2025, and February 5, 2025, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."
>
> (b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.
>
> (c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.
>
> (d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> (e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see also* Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And following the Executive Order 14168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female," "male," "girl," "woman," "boy," and "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[4]

Title IX and its implementing regulations never use the term "gender identity," let alone define the term, reinforcing that Title IX prohibits sex discrimination, not "gender identity" discrimination. And that makes sense: "gender identity" is subjective. As the President has explained, "gender identity" "reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'"

---

[4] U.S. Dep't of Health and Human Services, Office on Women's Health, Sex-Based Definitions, https://womenshealth.gov/article/sex-based-definitions (Nov. 14, 2025).

*L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 605 U.S. 495 (2025).[5] And according to a once blindly followed but now discredited organization, World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *United States v. Skrmetti*, 605 U.S. 495, 544 (2025) (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 547 (WPATH and other "prominent medical professionals . . . have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). Even the ACLU contends that "transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender." *See* ACLU, *Transgender People and the Law*, at 19-20.[6]

Simply put, "gender identity" is not "ascertainable at the moment of birth." *L.W.*, 83 F.4th at 487; *Skrmetti*, 605 U.S. at 550-51 (Barrett, J., concurring) (explaining that someone's status as "transgender" is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries . . . are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 566 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 576-77(similar). Or, as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] . . . but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[7] Quite sensibly, therefore, neither Title IX nor its implementing regulation address "gender identity."

In short, Title IX's bar on sex discrimination does not include discrimination on the basis of the subjective perception of one's own "gender." As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord*, *e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 814-15 (11th Cir. 2022) (en banc); *Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902, 920

---

[5] In a recent seminal decision, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibited providing controversial medical interventions to minors to address gender dysphoria. *United States v. Skrmetti*, 605 U.S. 495 (2025). The Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status." *Id.* at 510-15, 517-19. The law, the Court explained, easily passed the rational-basis standard because of the "medical and scientific uncertainty" surrounding interventions for "gender dysphoria." *Id.* at 522-25.

[6] https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.

[7] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services, 34 (May 1, 2025), https:// opa.hhs.gov/gender-dysphoria-report.

(D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment, which directed the Department of Education's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[8] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time.").[9] In fact, that evidence is even stronger here because Congress had the chance to disapprove of these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these contemporaneous regulatory interpretations of Title IX, including the regulation on athletics. That "highly counterintuitive result" cannot be right. *See Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions for more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. For example, when Congress enacted the

---

[8] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable)); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.")).

[9] *See also* Revised Letter of Impending Enforcement Action, Connecticut Interscholastic Athletic Conference, *et al.*, Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007, at 34 (Aug. 31, 2020) (looking to contemporaneous actions to demonstrate that "Title IX was passed . . . to protect equal athletic opportunity for students who are biological females, including [in] sex-segregated athletics").

Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress recognizes the difference between "sex" and "gender identity" and prohibits discrimination based on "gender identity" when it so intends; it did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).[10]

### D. Title IX's Exceptions for Sex-Segregated Intimate Facilities and in Athletics Are Rooted in Bona Fide Biological Distinctions Between the Two Sexes

As noted above, Title IX permits recipients to segregate students based on sex in intimate facilities, as long as the facilities "provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. And regarding athletics, such sex-based segregation is permitted "where selection for such teams is [1] based upon *competitive skill* or [2] the activity involved is a *contact sport*." 34 C.F.R. § 106.41(b) (emphasis added). Both exceptions are based on actual and relevant biological distinctions between males and females.

#### 1. Intimate Facilities

Making distinctions based on relevant biological differences between the sexes is not prohibited sex discrimination under Title IX. Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding. 20 U.S.C. § 1681(a). Discrimination in Title IX, just as elsewhere, means treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment." *Alabama Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). Thus, because the two sexes are usually similarly situated when it comes to educational programs, Title IX usually prohibits sex separation in academic programs. *See*, *e.g.*, 34 C.F.R. § 106.31(b), 106.34(a); *but see* 34 C.F.R. 106.34(b).

Critically, not *all* sex-based classifications are prohibited discrimination under Title IX. Acknowledging material biological differences between the sexes, Congress explicitly clarified

---

[10] *Bostock v. Clayton County*, 590 U.S. 644 (2020), is not to the contrary. *Bostock*, a Title VI case, does not extend to Title IX, and certainly not to sex-segregated athletics and intimate facilities, which are both expressly authorized under Title IX. Further, even on its own reasoning, *Bostock* would not yield a result different than the one articulated here. Unlike in *Bostock*, males and females are not similarly situated when it comes to athletics and intimate facilities, given their pertinent and real biological differences. Thus, treating all males as males (and all females as females) for the purposes of sex-segregated athletics and intimate facilities, notwithstanding each student's subjective perceptions of their "gender," is not, and logically cannot be, prohibited by Title IX.

that Title IX's general bar on sex discrimination must not "be *construed* to prohibit any" federal-funding recipient "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686 (emphasis added).

In particular, when students are in a state of undress, the biological differences between the sexes are pronounced and paramount. It is for that reason that Title IX's implementing regulations have, since Title IX's enactment, permitted separation based on sex in intimate facilities, authorizing "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. That regulation, which was reviewed by Congress before becoming effective, "accurately reflect[s] congressional intent" and reflects the statute's original public meaning. *Grove City*, 465 U.S. at 568; *Loper Bright*, 603 U.S. at 394.

"In light of the privacy interests that arise from the physical differences between the sexes, it has been commonplace and universally accepted—across societies and throughout history—to separate on the basis of sex those public restrooms, locker rooms, and shower facilities that are designed to be used by multiple people at a time." *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting). "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805.

Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05. Including the Supreme Court: The Court acknowledged that admitting women to the Virginia Military Institute for the first time "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996). Indeed, "as then-Professor Ruth Bader Ginsburg noted, 'separate places to disrobe, sleep, and perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." *Adams*, 57 F.4th at 804 (emphasis in original) (alterations omitted) (quoting Ruth Bader Ginsburg, The Fear of the Equal Rights Amendment, Wash. Post, Apr. 7, 1975, at A21).

Title IX recognizes as much. It thus allows recipients to assign sex-segregated living facilities, bathrooms, locker rooms, and shower facilities. 20 U.S.C. § 1686; 34 C.F.R. §§ 106.32(b), 106.33. Those rules are grounded in students' privacy, safety, and dignitary interest in using intimate facilities away from students of the opposite sex and in shielding their bodies from students of the opposite sex while in intimate facilities. Conversely, permitting people of the opposite sex into such sex-segregated spaces undermines those privacy, safety, and dignitary interests. *See*, *e.g.*, Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325 (indicating that policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets).

Thus, segregating intimate facilities on the basis of each person's subjective perceptions of their own "gender" does not merely read words into the regulation that are not there. It affirmatively violates Title IX by imposing on women and girls the very harms that Title IX and its implementing regulation 34 C.F.R. § 106.33 were intended to prevent. Title IX permits

recipients to segregate intimate facilities based on sex. It *prohibits* them from segregating intimate facilities based on subjective "gender identity."

**2. Contact Sports**

Title IX similarly permits recipients to operate sex-segregated athletics programs in sports "the purpose or major activity of which involves bodily contact." 34 C.F.R. § 106.41(b). There are two rationales for this exception. The first relates to student safety: Women tend to be lighter and smaller than men, thus putting women who are compelled to compete with men in contact sports in a significantly greater risk of danger. (As we discuss further below, the pertinent differences between men and women turn on biology, not subjective perception of one's "gender.")

The second rationale for the contact sports exception is similar to the rationale for segregating intimate spaces. Contact sports, such as wrestling and rugby, compel competitors to be in regular close—sometimes intimate—physical contact. The regulations rightly recognize that compelling men and women to wrestle against each other, for example, would often involve unwanted physical contact that is exceptionally intrusive and may even be perceived to be sexual in nature. For younger students, natural curiosity about the differences between the sexes might cause students in exceptionally close physical contact with members of the opposite sex to explore the ways in which their competitor's body differs from their own. For older students, sexual attraction might motivate a student to engage a competitor in ways that he or she would not have but for that sexual attraction. And for the student being touched, the mere *perception* (even if it is not true) that he or she is being touched due to sexual curiosity or sexual attraction can be exceptionally uncomfortable, distracting, and possibly even traumatic. The need to protect personal privacy could not be greater than where it involves potential unwanted or inappropriate direct physical contact that is or is perceived to be sexual in nature.

The regulations therefore permit recipients to draw a bright line, segregating participation in contact sports on the basis of sex, even if that means that members of one sex are denied the opportunity to play that particular contact sport. *See* 34 C.F.R. § 106.41(b) (distinguishing the competitive skill and contact sport rationales on this point); *but see* 34 C.F.R. § 106.41(c) (demanding "equal athletic opportunity for members of both sexes").

To be sure, unwanted or inappropriate physical contact, including sexual contact, can and does occur between members of the same sex. But eliminating that from student athletics entirely would require a ban on all contact sports. The regulations, quite rightly, impose no such categorical prohibition. Instead, recognizing that the likelihood of unwanted or inappropriate touching is far greater when members of *different* sexes compete against each other in contact sports, the regulations permit recipients to keep contact sports limited to members of a single sex, who all share the same biological features.

**3. Competitive Skill**

The regulations further permit recipients to segregate components of their athletics program on the basis of sex when "selection for such teams is based upon competitive skill." 34 C.F.R. § 106.41(b). The regulations thus acknowledge an obvious truth: men and women are different, not just in appearance but also in their physical abilities.

"It is beyond dispute that, barring rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes," and this biological trait "determines many of the physical characteristics relevant to athletic performance." *B.P.J. v. W. Virginia State*

*Bd. of Educ.*, 98 F.4th 542, 567 (4th Cir. 2024) (Agee, J., dissenting in relevant part), *cert. granted*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025). On average, males and females differ with respect to attributes like height, weight, bone structure, muscle mass, and heart and lung capacity. *See, e.g.*, *id.* at 567-68; *Adams*, 57 F.4th at 819-20 (Lagoa, J., concurring) (discussing scientific literature regarding biological advantages of males over females in many sports). This results in males being stronger and faster than females, all else being equal—*i.e.*, if they have had similar environmental experiences and possess similar genetic traits other than the different sex chromosome.

This biological fact has legal implications. For example, in *United States v. Virginia*, the Supreme Court found that admitting women to a previously all-male military academy "would undoubtedly require" that institution "to adjust aspects of the physical training programs." 518 U.S. 515, 550 n.19 (1996). Similarly, in *Bauer*, the Fourth Circuit recognized that "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs." 812 F.3d at 350. "[T]o account for the[se] innate physiological differences," the FBI has adopted sex-normed physical-fitness standards for special agents: *e.g.*, men must do 30 push-ups and run 1.5 miles in 12 minutes and 24 seconds, whereas women need only do 14 push-ups and run 1.5 miles in 13 minutes and 59 seconds. *See id.* at 343-44; U.S. Fed. Bureau of Investigation, U.S. Dep't of Justice, Special Agent Physical Requirements, https://fbijobs.gov/special-agents/physical-requirements. The Fourth Circuit held that the adoption or implementation of such sex-based standards do not constitute discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). *Bauer*, 812 F.3d at 351. Congress has likewise recognized that "physiological differences between male and female individuals" warrant sex-based differences in physical-fitness admissions standards at military academies. Pub. L. No. 94-106, Tit. VIII, § 803(a), Oct. 7, 1975, 89 Stat. 537-538 (10 U.S.C. § 7442 note).

So too with regard to Title IX: the regulations permit recipients to separate males and females in their athletics programs to the extent that doing so reflects a difference in the competitive skill of the sexes. 34 C.F.R. § 106.41(b).[11]

### E. Equal Athletic Opportunity is Denied When Men and Boys Are Permitted to Play in Women's and Girls' Sports

The regulations further require "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members

---

[11] Though the sexes' divergence in athletic performance grows in adulthood, it rests on innate biological differences that exist at birth and manifest during childhood. Sex chromosomes give rise to "pre-puberty physical differences that affect athletic performance." *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring); *see B.P.J.*, 98 F.4th at 568 (Agee, J., dissenting in relevant part) ("there is evidence that biological boys have a competitive advantage over biological girls even before puberty"). The undeniable physiological differences between males and females provide boys and men with inherent advantages in strength, speed, and physicality that pre-determine the outcome of athletic contests. "Males and females are materially different with respect to the main physical attributes that contribute to athletic performance." Doriane Lambelet Coleman et. al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 92 (2020) (citing *The Role of Testosterone in Athletic Performance*, Duke Ctr. for Sports Law & Policy (Jan. 2019)). https://law.duke.edu/sites/default/files/centers/sportslaw/Experts_T_Statement_2019.pdf.

of both sexes." 34 C.F.R. § 106.41(c). The regulations provide a list of factors that OCR considers when assessing the equality of opportunity, and direct OCR not to rest any decision on "[u]nequal aggregate expenditures for members of each sex." *Id.* This often yields a complex multi-factor analysis. Not so here.

As explained above, 34 C.F.R. § 106.41(a) prohibits discrimination on the basis of sex in athletics programs. 34 C.F.R. § 106.41(b) permits recipients to offer sex-segregated athletics in certain specific contexts. Within those contexts, males are able to participate on male-only teams. Sections 106.41(b) (for non-contact sports) and 106.41(c) both generally require that women be afforded the opportunity to participate on corresponding female-only teams.

Recipients that permit men and boys to compete on women's and girls' teams on the basis of their subjective perception of their "gender" thus presumptively violate § 106.41(c) and § 106.41(b) (for non-contact sports). Such recipients allow men to engage in fair and safe competition against other men while subjecting women to unfair and unsafe conditions, subjecting them to risk of injury, displacing them from podiums in athletic competitions, causing them to lose opportunities for advancement to regional and national competitions, and to miss out on critical visibility for future opportunities and recognition. That unequal treatment denies them "equal athletic opportunity" in violation of Title IX. 34 C.F.R. § 106.41(c); *see* Executive Order 14,201, 90 Fed. Reg. at 9279 ("In recent years, many educational institutions and athletic associations have allowed men and boys to compete in women's and girls' sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 294-95 (2d Cir. 2004) ("Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

Title IX's purpose confirms as much. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[The Court] must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (quotation marks omitted)). Title IX was manifestly passed to promote "girls' and women's rights." *Adams*, 57 F.4th at 817 (Lagoa, J., concurring); *see McCormick*, 370 F.3d at 286 ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities."). And Title IX has achieved substantial success in that regard, especially in the realm of sports. "[O]ne need not look further than the neighborhood park or local college campus to see the remarkable impact Title IX has had on girls and women in sports." *Adams*, 57 F.4th at 818 (Lagoa, J., concurring). "In 1971, before Congress enacted the statute, approximately 300,000 girls and 3.67 million boys played competitive high school sports nationwide." *McCormick*, 370 F.3d at 286. Today, Title IX "has had stellar results." *Louisiana*, 737 F. Supp. 3d at 390. By 1999, 2.6 million girls participated in interscholastic athletics. By 2011, that number was 3.25 million. *Id.*

Policies or practices that "comingl[e] both biological sexes in the realm of female athletics" have "vast societal consequences" and "threaten to undermine one of Title IX's major achievements, giving young women an equal opportunity to participate in sports." *Adams*, 57 F.4th at 818, 821 (Lagoa, J., concurring) (brackets omitted); *see Clark v. Arizona Interscholastic Ass'n* (*Clark II*), 886 F.2d 1191, 1193 (9th Cir. 1989) ("If males are permitted to displace females on the school volleyball team even to the extent of one player . . . , the goal of equal participation by females in interscholastic athletics is set back, not advanced."). This confirms that creating new

extra-statutory privileges based on "gender identity" for otherwise sex-separate sports violates Title IX.[12]

### F. The Department Has Authority to Enforce Title IX and Its Implementing Regulations Against Noncompliant Recipients of Federal Funding.

If OCR "finds that a recipient has discriminated against persons on the basis of sex in an education program or activity under this part, or otherwise violated this part," then the noncompliant "recipient must take such remedial action" as OCR "deems necessary to remedy the violation, consistent with 20 U.S.C. § 1682." 34 C.F.R. § 106.3.

As a condition of receiving federal financial assistance from the Department of Education, a recipient must make an assurance that the education program or activity will be operated in compliance with Title IX. 34 C.F.R. § 106.4(a). The obligation to comply with Title IX is "not obviated or alleviated by any State or local law" or "by any rule or regulation of any organization, club, athletic or other league, or association." 34 C.F.R. § 106.6(b)-(c).

34 C.F.R. § 106.81 incorporates "[t]he procedural provisions applicable to Title VI of the Civil Rights Act of 1964," which are codified at "34 CFR 100.6 through 100.11 and 34 CFR part 101." 34 C.F.R. § 100.7 authorizes OCR to investigate possible deprivations of the rights protected by the statutes within its jurisdiction. And 34 C.F.R. § 100.8(c)-(d) authorizes, *inter alia*, "the suspension or termination of or refusal to grant or to continue federal financial assistance" or referral "to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States."

Moreover, all federal grant recipients from the Department are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders. 34 C.F.R. §§ 75.500 and 75.700. Specifically, 34 C.F.R. § 75.500 states in relevant part: "Each grantee must comply with the following statutes and regulations: . . . Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), 34 CFR part 106. . . ." And 34 C.F.R. § 75.700 states:

> A grantee must comply with § 75.500, applicable statutes, regulations, *Executive orders*, stated institutional policies, and applications, and must use Federal funds in accordance with the U.S. Constitution and those statutes, regulations, *Executive orders*, stated institutional policies, and applications.

34 C.F.R. § 75.700 (emphasis added).

---

[12] To explain the meaning of "equal athletic opportunity" and "effective accommodation" under 34 C.F.R. § 106.41(c), OCR issued a Policy Interpretation, entitled Title IX of the Education Amendments of 1972—A Policy Interpretation: Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (1979) ("Policy Interpretation"). The Policy Interpretation provides a "three-part test" to assess compliance. *See Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 786 (8th Cir. 2021). The "three-part test" can be, and has been, used by OCR and courts to apply § 106.41(c). *It is not applicable here*. The three-part test is a helpful tool to determine when efforts to provide women and girls with an equal athletic opportunity have been effective. It has nothing to say when a recipient's policies and practices deny women and girls access to sex-segregated athletics opportunities.

### G. Recipients of Federal Funding Must Provide OCR Access to Sources of Information Pertinent to Ascertain Compliance with Title IX

The regulations further provide:

> *Access to sources of information.* Each recipient shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part. Where any information required of a recipient is in the exclusive possession of any other agency, institution or person and this agency, institution or person shall fail or refuse to furnish this information the recipient shall so certify in its report and shall set forth what efforts it has made to obtain the information. Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part. Information of a confidential nature obtained in connection with compliance evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

34 C.F.R. § 100.6(c). In accordance the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and FERPA's implementing regulation at 34 C.F.R. § 99.31(a)(3)(iii), OCR is authorized to review personally identifiable information in a recipient's records without redaction of private or confidential student information.

## II. Findings of Fact

### A. Kansas City Kansas Public Schools, USD 500, is a Recipient of Federal Funding and Subject to Title IX and to OCR's Enforcement Authority.

Kansas City Kansas Public Schools, USD 500, is currently, and has for many years been a recipient of federal financial assistance from the U.S. Department of Education through grants administered by the Kansas Department of Education. The school district has approximately $55,569,486 in federal funding budgeted for expenditure during the 2025-2026 school year.[13] The most current "Assurances and Certifications" executed by Kansas City Kansas Public Schools, USD 500, occurred April 22, 2025, which includes an assurance that Kansas City Kansas Public Schools, USD 500, will comply with all of the requirements of Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq*., and its implementing regulation, 34 C.F.R. Part 106. The school district has approximately 22,000 students enrolled and offers a Head Start program, four preschools, 28 elementary schools, 7 middle schools, and 5 high schools.

All federal grant recipients from the Department, including Kansas City Kansas Public Schools, USD 500, are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders. 34 C.F.R. §§ 75.500 and 75.700. As a recipient of federal financial assistance the Kansas City Kansas Public Schools, USD 500 is subject to Title IX, its implementing regulations, Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025),

---

[13] https://resources.finalsite.net/images/v1763405778/kckpsorg/tlxncwcphhsdlmuxehqx/3BAG500-2026.pdf

Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions), and to OCR's enforcement jurisdiction.

**B. Denial of Access**

The Department made multiple attempts to obtain information from the Kansas City Kansas Public Schools, USD 500, including written requests for records and an opportunity to schedule interviews with district staff.[14] The District did provide some publicly available records in response to the Department's August 22, 2025, Data Request in this investigation, but the District's data response was far from forthcoming or complete. Despite the Department's multiple requests, and notwithstanding the District's obligations under federal law as a recipient of federal funding, the District failed to provide the Department with access to sources of information and its facilities to ascertain compliance with Title IX and FERPA. The District's refusal to provide the Department records and access was intentional, and it prejudiced the Department's ability to make a full compliance determination regarding Title IX and FERPA.

Through written correspondence with the Department, the District acknowledged information requested by the Department in this investigation was being withheld by the District, including information the District considered "privileged." The District also responded to the Department's Data Request stating that any information or records responsive to the Department's Data Request that are beyond the publicly available documents or the vague and generalized responses to the Department's specific requests for information would be made available to the Department onsite. However, the District has failed or refused to respond to the Department's multiple attempts to submit the required information or schedule an onsite visit to access the information. The failure or refusal of the District to provide the Department with access to the information needed to determine compliance was intentional and materially impacted the Department's ability to conduct the investigation.

**C. Kansas City Kansas Public Schools' Policy Guidance and Practices**

Based on the limited information OCR was able to obtain from the District and publicly available information, OCR makes the following findings and conclusions.

**1. District Guidance and Practices Related to "Transgender" and "Gender Non-Conforming" Students**

Although it appears the District does not have a publicly posted policy or procedure regarding the use of District provided sex-separated restrooms, locker rooms, or changing rooms based on a student's "gender identity" or similar terms, or student participation in sex-separated interscholastic athletic or intermural programs based on a student's "gender identity" or similar terms, the District informed OCR that the District uses written guidance entitled *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document.* The Department also located publicly available records indicating on September 18, 2017, the USD 500 School Board also accepted an "informational report" from the Superintendent entitled *Supporting Transgender and Gender Non-Conforming Students in the Kansas City Kansas School*

---

[14] The Department made attempts to obtain full compliance with the Department's Data Request and/or to discuss a voluntary resolution agreement on: August 22, 2025; August 28, 2025; September 3, 2025; February 5, 2026; and March 17, 2026.

*District*. Both Documents will be discussed in detail herein.

### ***a. USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document***

The District's September 19, 2025, limited response to the Department's August 22, 2025, Data Request, states that the Kansas City Kansas Public Schools, USD 500, "does not have a policy or documented procedure, but instead has adopted an internal guidance document titled 'USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document.'" The document provided by the District is undated. The District has not indicated whether the *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document* has been adopted or approved by the Kansas City Kansas Public Schools, Board of Education.

The *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document* provided by the District states in relevant part:

> 2. . . .*If it becomes known that the student does not want the student's parent or legal guardian included at this stage, that request will be evaluated on a case-by-case basis*. Such requests will be evaluated by the Executive Director of Student Services & Family Support, Director of Student Support Programs, Assistant Superintendent of Organizational Development, and the district's attorney. When reviewing the request, the district will consider the student's age, the student's grade level, the student's welfare based on the information available to the district at that time, and any other relevant information.
>
> 3. Upon the request of a transgender or gender non-conforming student or that student's parent or legal guardian, *the district will schedule a school planning meeting to discuss topics relevant to that student's school attendance including*:
> a. Preferred name;
> b. Preferred gender;
> c. Preferred pronouns;
> d. School records/database;
> e. School support designee;
> f. *Restroom and locker room use (including PE)*;
> g. Field trips
> h. *Plans for gendered activities (e.g., sports)*;
> i. Additional resources
> j. Staff training plan; and
> k. Any other relevant topics.
>
> . . .
>
> 5. *If the student asks to exclude the student's parent(s)/legal guardian(s) from the school planning meeting*, that request will be evaluated on a case-by-case basis. *Likewise, if the student does not want his or her transgender or gender non-conforming status disclosed to the student's parent(s)/legal guardian(s),* that request will also be evaluated on a case-by- case basis. . .

> 6. The plan developed at the school planning meeting will be reduced to writing with a copy provided to the Executive Director of Student Services & Family Support and the parent or legal guardian or the student, *depending on the determination made pursuant to paragraph 5, above.*
>
> 7. After the plan has been reduced to writing, an implementation meeting will be held. . .Individuals who should be considered for implementation meeting attendance include: …*Athletic coaches*…
>
> . . .
>
> 12. A copy of the plan will be maintained with the Executive Director of Student Services & Family Support, Director of Student Support Programs. Assistant Superintendent of Organizational Development and the office of the Building Principal.

USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document (emphasis added).

### *b. Report from the Superintendent: Supporting Transgender and Gender Non-Conforming Students in the Kansas City Kansas School District*

In the District's September 19, 2025, limited response to the Department's August 22, 2025, Data Request, the District argued that the *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School* referenced in the Department's Notification Letter are not relevant to the investigation because those guidelines have "never been adopted, approved, or utilized" by the school district, because the guidelines were not presented to the Kansas City Kansas Public Schools Board of Education for approval or adoption, but were instead merely presented as "an information item of the District Plan for supporting our Transgender and Gender Non-Conforming Students." (September 18, 2017, Memorandum from Dr. Cynthia Lane, Superintendent of Schools, to the Kansas City Kansas Public Schools Board of Education).[15]

On September 18, 2017, the Kansas City Kansas Public Schools Board of Education accepted an "informational report" from the Superintendent entitled: *Supporting Transgender and Gender Non-Conforming Students in the Kansas City Kansas School District*.[16] Members of the Kansas City Kansas Public Schools Board of Education also participated in a training presented by the Kansas City, Kansas Public Schools Director of Professional Workforce Development entitled: *Meeting the Needs of Our Gender Non-conforming and Transgender Students: Creating Equity through Policy Change and Professional Development*.[17] A key portion of the informational report included a guidance document on Kansas City Kansas Public Schools Letterhead, entitled: *Kansas City Kansas Public Schools Guidelines for Transgender and Gender*

---

[15] https://go.boarddocs.com/ks/kckps/Board.nsf/files/AR8NP45F4208/$file/Transgender%20and%20Gender%20Non-Comforming%20Student

[16] *Id.*

[17] https://go.boarddocs.com/ks/kckps/Board.nsf/files/AR8NGT5E9F11/$file/Training%20for%20Board%20091817.pdf

*Non-conforming Students at School.*[18] The goal of the meeting was stated to be: "That the Kansas City Board of Education accept as an informational item the district plan for supporting our transgender and gender non-conforming students as submitted by Dr. Kelli Mather, Chief Operations Officer, Shelly Beech, Director of Professional Workforce Development and as recommended by Dr. Cynthia Lane, Superintendent of Schools."[19]

The *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School*, states in relevant part:

> II. Definitions
>
> The definitions provided here are not intended to label students but rather to assist in understanding. Students might or might not use these terms to describe themselves.
>
>> A. "Gender identity" is a person's deeply held sense or psychological knowledge of his or her own gender, regardless of the gender they were assigned at birth. Everyone has a gender identity.
>>
>> B. "Transgender" describes people whose gender identity is different from their gender assigned at birth.
>>
>> C. "Gender expression" refers to the way a person expresses gender, such as clothing, hairstyles, activities, or mannerisms.
>>
>> D. "Gender nonconforming" describes people whose gender expression differs from stereotypical expectations, such as "feminine" boys, "masculine" girls, and those who are perceived as androgynous.
>
> III. Guidelines
>
>> A. Privacy. All persons, including students, have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.
>>
>>> 1. Information about a student's transgender status, legal name, or gender assigned at birth also may constitute confidential medical information. School personnel should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others, *including parents* and other school personnel, unless legally required to do so or *unless the student has authorized such disclosure*.
>>>
>>> 2. Transgender and gender nonconforming students have the right to discuss and express their gender identity and expression openly and to decide when, with whom, and how much to share private information. *When contacting the*

---

[18]https://go.boarddocs.com/ks/kckps/Board.nsf/files/AR8NN95EEAD2/$file/District%20Transgender%20Guidelines.6.7.17.pdf

[19] https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=AR8NFK5E2C77

> *parent or guardian of a transgender or gender nonconforming student, school personnel should use the student's legal name and the pronoun corresponding to the student's gender assigned at birth unless the student, parent, or guardian has specified otherwise.*

. . .

F. Restroom Accessibility

1. Students shall have access to the restroom that corresponds to their gender identity consistently asserted at school.

2. Any student who has a need or desire for increased privacy, regardless of the underlying reason, may be provided access to a single stall restroom, but no student shall be required to use such a restroom.

G. Locker Room Accessibility

1. The use of locker rooms by transgender students shall be assessed on a case-by- case basis with the goals of maximizing the student's social integration and equal opportunity to participate in physical education classes and sports, ensuring the student's safety and comfort, and minimizing stigmatization of the student.

2. In most cases, *transgender students should have access to the locker room that corresponds to their gender identity consistently asserted at school.*

3. Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided with a reasonable alternative changing area such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, a P.E. instructor's office in the locker room, or a nearby health office restroom), or with a separate changing schedule (e.g., using the locker room that corresponds to their gender identity before or after other students). Any alternative arrangement should be provided in a way that protects the student's ability to keep his or her transgender status confidential. *In no case shall a transgender student be required to use a locker room that conflicts with the student's gender identity.*

H. Physical Education Classes & Intramural Sports

1. Transgender and gender nonconforming students *shall be permitted to participate in physical education classes and intramural sports in a manner consistent with their gender identity.*

I. Interscholastic Competitive Sports Teams

1. Transgender and gender nonconforming students *shall be permitted to participate in interscholastic athletics in a manner consistent with their gender identity and in compliance with the*

*rules and regulations of the Kansas State High School Activities Association.*

2. Procedures:

a. Notice to the School: The student and/or parents of a transgender student shall contact the school principal or athletic director indicating that the student has a consistent gender identity different than the gender listed on the student's school registration records of state birth record, and that the student desires to participate in activities in a manner consistent with his or her gender identity.

b. The school shall review the following in making their decision regarding participation:

- Gender identity used for school records
- Medical documentation
- Gender identity related to advantages to the student if participation is approved
- Any other relevant information provided by the parent and/or student

c. If the school approves competing on a team consistent with the student's gender identity, the athletic director or school principal shall notify the KSHSAA, prior to entering the student in the KSHSAA eligibility system and allowing participation.

d. Once a student elects to participate on a team consistent with their gender identity, the student must participate in that gender category in all sports for the remainder of their scholastic eligibility in grades 7-12. Annual renewal is not required.

e. In the event of a dispute over the student's participation, the KSHSAA Executive Board will make final rulings.

Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School (Revised 10.31.16).

Turning back to the District's argument that *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School* is merely information received by the school board, the Department concludes the District is attempting to mislead the Department in this investigation. A review of the publicly available documents related to the "information item" reveals material aspects that were omitted from the District's explanation to the Department. The document entitled *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School* purports to be, on its face, a guidance document used by Kansas City Kansas Public Schools. The document was presented by the Superintendent of Schools, on school district letterhead. It is not marked as a draft or proposal. It is disingenuous for the District to argue that the guidelines were never adopted or approved by the school board, given that it does not appear based on the available information that the materials were ever presented as

a document to be adopted or approved by the Board. The evidence is that the guidelines were instead presented as "an information item of the District Plan for supporting our Transgender and Gender Non-Conforming Students." (September 18, 2017, Memorandum from Dr. Cynthia Lane, Superintendent of Schools). In other words, the evidence obtained by the Department supports the conclusion that the Superintendent was not asking the Kansas City Kansas Public Schools Board of Education for permission to utilize the guidance document, but was instead informing the school board of the guidelines being used by the school district.

Given the lack of information available to the Department because of the school district's refusal to cooperate with the investigation, the Department finds that the "information item" presented to the Kansas City Kansas Public Schools Board of Education on September 18, 2017, describes the guidelines the District was applying to students. It is unclear whether or when the guidance document provided to the Department amended the guidance document presented to the Kansas City Kansas Board of Education on September 18, 2017, or even if the guidance document provided to the Department has been adopted or approved by the Kansas City Kansas Board of Education. Given the intentionally vague and incomplete response from the District, and the fact that both guidance documents indicate a violation of Title IX, the Department concludes the District is not in compliance with Title IX. Had the District cooperated with the Department's investigation, any perceived misunderstanding by the Department could have been addressed.

**2. Student Records**

The District's published policies regarding student records are Policies JR and JRB. Policy JRB applies to the release of student records.[20] Policy JR states in relevant part:

> All student records shall be treated as confidential and primarily for local school use unless otherwise stipulated. Access to student records . . . shall be permitted as set for in Board policies JR and JRB.
>
> . . .
>
> In situations where the parents of a student are divorced or separated, each parent, custodial and/or non-custodial, shall have equal rights to their child's records unless a court order specifies otherwise. Private agreements between the student's parents shall not be recognized by the district's personnel.
>
> Any eligible parent/guardian or student may inspect the personal records of the student during regular school office hours. The district reserves the right to interpret selected records to students and/or parent/guardians at the time of the inspection.

District Policy - JR.[21]

Neither of the District's published policies regarding student records contain exceptions for students who ask to exclude the student's parent(s)/legal guardian(s) from having access to student records, but the guidance documents entitled *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document* and *Supporting Transgender and Gender Non-*

---

[20] https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=9PFV6A7E2E97
[21] https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=9PFUX67C4418

*Conforming Students in the Kansas City Kansas School District,* purport to do just that.

### 3. Restrooms, Locker Rooms, and Changing Rooms

The Department asked the District whether the District provides sex-separated restrooms, locker rooms, or changing rooms, when the District began providing sex-separated restrooms, locker rooms, or changing rooms, and why the District provides sex-separated restrooms, locker rooms, or changing rooms. The District joined in a general multi-school district response to the Department's Data Request, generally stating "school buildings are each outfitted with typical sex-separated restrooms and locker rooms that would be present in any school building or other public building in accordance with 34 C.F.R. §106.33." The District, however, failed to provide information regarding when the District began providing sex-separated restrooms, locker rooms, or changing rooms, and why the District provides sex-separated restrooms, locker rooms, or changing rooms. The District also failed or refused to provide the Department any information indicating knowledge of students using restrooms, locker rooms, or changing rooms designated for the opposite sex, or knowledge of any concerns of such a practice voiced by parents/guardians and/or students, even though specifically asked about such information.

### 4. Interscholastic Athletics

The District's published policy regarding interscholastic athletics is found in policy JH Student Activities.[22] Policy JH states, in relevant part, that any student meeting the eligibility requirements of the Kansas State High School Activity Association (KSHSAA) shall be permitted to participate in the activity.

The Department was unable to locate any other policies or guidance the District has regarding student participation in athletics beyond the *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School* (Revised 10.31.16) and the *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document* described above.

The Department found no evidence that the District has developed and implemented a procedure required under 34 C.F.R. § 106.31(d) that is designed to assure the District that the KSHSAA takes no action that the District would be prohibited from taking under Title IX as a recipient of federal funding.

### 5. KSHSAA Policies for Transgender Student Participation

The *KSHSAA Policies for Transgender Student Participation* states:

> Kansas interscholastic activities under the jurisdiction of the KSHSAA shall be expressly designated as one of the following based on biological sex:
>
> 1. Males, men, or boys,
>
> 2. females, women, or girls; or
>
> 3. coed or mixed.
>
> Athletic teams or sports designated for females, women or girls shall not be open to students of the male sex. Biological sex means the biological

---

[22] https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=9PFR7N69C053

indication of the male and female in the context of reproductive potential or capacity such as sex chromosomes, gonads and nonambiguous internal and external genitalia present at birth, without regard to an individual's psychological, chosen or subjective experience of gender.

. . .

For students not covered by [the *Fairness in Women's Sports Act*] . . .

The Kansas State High School Activities Association Executive Board approves this policy to address the participation of transgendered students in all KSHSAA sponsored athletics and activities.

For the purpose of this policy the following definitions will be in place:

• Transgendered: a person whose gender identity doesn't match the sex assigned to him or her at birth.

• Intersex: a person who is born with a reproductive or sexual anatomy and/or chromosome pattern that doesn't seem to fit the typical definitions of female or male.

• Gender Identity: a person's deeply-felt internal sense of being male or female.

• Gender Expression: a person's external characteristics and behaviors that are socially defined as either masculine or feminine (dress, speech, mannerisms, social interactions, etc.)

. . .

School Procedure:

1) The student and/or parents shall contact the school principal or athletic director at the KSHSAA member school notifying them that the student has a different gender identity than listed on the student's school registration records or birth certificate and that the student wishes to participate in athletics/activities in a manner consistent with their gender identity. Gender identity of the student must be bona fide and not for the purpose of "gaining an unfair competitive advantage."

It is recommended schools review the following in making their decision regarding participation:

a. Gender identity used for school registration records

b. Medical documentation (length and duration of hormonal treatments, sexual re-assignment surgery; psychological counseling, medical records, etc.)

c. Gender Identity related advantages to the student if participation would be approved

2) The school is responsible to determine the appropriate gender team for participation by the student. Once this determination is

> made, the school is responsible to notify the KSHSAA if a student intends to participate on a team opposite their birth gender. Notification must be given prior to entering the student in the KSHSAA eligibility system and allowing participation.
>
> 3) Once a student is identified as transgender and elects to participate, they will participate in that gender category in all sports, for the remainder of their scholastic eligibility in grades 7-12. Annual renewal is not necessary.
>
> 4) Transfer Student – A student identified by their initial school as transgender for activity participation, should expect a new school to which they transfer, to perform its' own due diligence and make its' own gender determination regarding participation at the new school.
>
> 5) KSHSAA Mixed Team Rule 23, does not eliminate a school's opportunity to maintain a boys and girls team if a transgender student participates on a team opposite their birth gender.
>
> The KSHSAA Executive Board will make final rulings on student participation in the event of a dispute. . .

KSHSAA Policies for Transgender Student Participation.[23]

## D. Kansas City Kansas Public Schools, USD 500 – Athletic Programs

### 1. Sex-Separated Boys' and Girls' Athletic Programs

Interscholastic athletic opportunities for girls have been historically limited. "During the period from 1971-1978, for example, the number of female participants in organized high school sports increased from 294,000 to 2,083,000—an increase of over 600 percent." *Policy Interpretation*, 44 Fed. Reg. at 71,419; *see* Women's Sports Foundation, 50 Years of Title IX infographic (2022).[24]

The Kansas City Kansas Public Schools, USD 500, has a long history of providing sex-separated athletic programs to male and female students. Providing a variety of sex-separated athletic programs is a proven way to provide equal athletic opportunities for girls. *See, e.g.*, *Clark ex rel. Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("[T]he governmental interest claimed is redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes. There is no question that this is a legitimate and important governmental interest.").

Following is an example of some of the sex-separated interscholastic athletic programs provided by Kansas City Kansas Public Schools, USD 500, for high school boys and girls[25]:

**Boys' Programs**

- Baseball

---

[23] https://www.kshsaa.org/public/pdf/transgenderpolicyrecommendations.pdf
[24] https://www.womenssportsfoundation.org/wp-content/uploads/2022/04/FINAL6_WSF-Title-IX-Infographic-2022.pdf.
[25] https://www.kckschools.org/operations/district-athletics/activities-list

- Basketball
- Bowling
- Cross Country
- Football
- Soccer
- Swimming
- Tennis
- Track & Field
- Wrestling

**Girls' Programs**

- Basketball
- Bowling
- Cross Country
- Soccer
- Softball
- Swimming
- Tennis
- Track & Field
- Volleyball
- Wrestling

The Kansas City Kansas Public Schools is a member of the Kansas State High School Activities Association (KSHSAA), which is the state-level member association representing Kansas Kansas in the National Federation of State High School Associations (NFHS). As part of KSHSAA, the Kansas City Kansas Public Schools follow rules for sports and activities set by the NFHS. The NFHS implicitly recognizes there are physical differences between boys and girls that are so significant, such that the differences between the sexes not only justify, but require, high school athletic programs to provide sex-separated athletics in many sports. This is evidenced by the different standards in boys' and girls' athletic competitions for equipment in several sports that would constitute impermissible sex discrimination unless supported by the fact that boys and men have physical advantages over girls and women in many sports, including the following sample of examples:[26]

- Basketball: boys use a ball that is 29.5in (size 7), and girls use a ball that is 28.5in (size 6);
- Shot put: the minimum weight of the shot is 12 lbs. (5.443kg) for boys and 8.818 lbs. (4.0kg) for girls; for boys, the minimum diameter shall be no less than 3.873 inches (98.4mm), while maximum diameter shall not exceed 4.625 inches (117.5mm) and for girls, the minimum diameter shall be no less than 3.740 inches (95mm), while maximum diameter shall be

[26] https://www.nfhs.org/media/6892897/nfhs-track-and-field-pre-meet-notes_2023_final.pdf; https://www.nfhs.org/media/7213496/rule-comparison-document-24-25-final-v2.pdf; https://www.osaa.org/docs/btf/2023_Shot_Put_and_Discus_Implement_Specifications.pdf; https://www.nfhs.org/media/5989329/2023-nfhs-track-and-field-field-events-diagrams-final.pdf

no more than 4.331 inches (110mm);

- Discus: the minimum weight of the discus is 3.527 lbs. (1.6kg) for boys and 2.205 lbs. (1.0kg) for girls; the diameter of the boys' discus must be at least 8.228 inches (209mm), but not more than 8.307 inches (211mm), the diameter of the girls' discus must be at least 7.087 inches (180mm), but not more than 7.165 inches (182mm);
- Hurdles: boys use hurdles that are 39 inches high, girls use hurdles that are 33 inches high;
- Lacrosse: boys' lacrosse is a full-contact sport, requiring protective gear like helmets, shoulder pads, and gloves, while girls' lacrosse is non-contact and typically only requires eyewear and a mouthguard;
- Long jump: Recommended distances from the foul line or take off board for boys is 12 feet, for girls 8 feet; and
- Triple jump: Recommended distances from the foul line or take off board for boys is 32 feet, for girls 24 feet.

2023 NFHS Track and Field Pre-Meet Notes, p. 12.

The school district's own actions of historically providing sex-separated interscholastic athletic programs and belonging to organizations who separate athletics by sex, implicitly recognizes biological differences between boys and girls that are so significant that the differences between the sexes justify sex-separated interscholastic athletic programs in many sports. The physiological differences between males and females exist regardless of how a person claims to identify and regardless of what medical interventions the person has undergone. *See, e.g.*, *Adams*, 57 F.4th at 819-21 (Lagoa, J., concurring). That is why "the Title IX framework effectively requires a recipient to maintain separate sports teams." *Soule*, 90 F.4th at 63 & n.8 (Menashi, J., concurring) (collecting cases). "Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor*, 449 U.S. at 1307 (Stevens, J., in chambers). Separating competitive-skill and contact-sport athletic programs by sex promotes equal athletic opportunity, as Title IX and longstanding regulations require. *See Clark I*, 695 F.2d at 1131 ("[T]he governmental interest claimed is redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes. There is no question that this is a legitimate and important governmental interest.").

The District appears to rely on the guidance document *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School*, and the policies and practices of the KSHSAA, to determine student eligibility in interscholastic athletics.

## III. Denial of Access

The Department made multiple attempts to obtain information from the District, including written requests for records and an opportunity to schedule interviews with district staff.[27] The District did provide some publicly available records in its September 19, 2025 response to the

[27] The Department made attempts to obtain full compliance with the Department's Data Request and/or to discuss a voluntary resolution agreement on: August 22, 2025; August 28, 2025; September 3, 2025; February 5, 2026; and March 17, 2026.

Department's August 22, 2025, Data Request in this investigation, but the District's data response was far from forthcoming or complete. Despite the Department's multiple requests, and notwithstanding the District's obligations under federal law as a recipient of federal funding, the District failed to provide the Department with access to sources of information and its facilities to ascertain compliance with Title IX and FERPA. The District's refusal to provide the Department with access to information was intentional, and it prejudiced the Department's ability to make a full compliance determination regarding Title IX and FERPA.

As a recipient of federal funding from the U.S. Department of Education, the District is obligated to provide the Department access to sources of information necessary for the Department to determine the District's compliance with federal law. 34 C.F.R. §§ 99.62, 100.6. The District is required by 34 C.F.R. § 100.6(c) and 34 C.F.R. § 99.62 to provide all relevant records and reports to the Department, and to do so without redactions. Through written correspondence with the Department, the District acknowledged information requested by the Department in this investigation was being withheld by the District, including information the District considered "privileged." As a recipient of federal funding, the District's intentional withholding of any information, whether "privileged" or not, is inconsistent with the District's obligations under federal law. The Title IX implementing regulation relating to access to sources of information is found at 34 C.F.R. § 106.81, which incorporates the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. Those procedures state in relevant part at 34 C.F.R. § 100.6:

> (c) *Access to sources of information.* Each recipient shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part. Where any information required of a recipient is in the exclusive possession of any other agency, institution or person and this agency, institution or person shall fail or refuse to furnish this information the recipient shall so certify in its report and shall set forth what efforts it has made to obtain the information. *Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part.* Information of a confidential nature obtained in connection with compliance evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

34 C.F.R. § 100.6 (emphasis added).

Additionally, with regard to FERPA compliance, recipients of federal funding are required "to submit reports, information on policies and procedures, annual notifications, training materials, or other information necessary to carry out the Office's enforcement responsibilities" to the Department in accordance with 34 C.F.R. § 99.62.

The District responded to the Department's Data Request stating that any information or records responsive to the Department's Data Request that are beyond the publicly available documents or the vague and generalized responses to the Department's specific requests for information, would be made available to the Department onsite. However, the District failed or refused to respond to the Department's attempts to schedule an onsite visit to access the information. Accordingly, the Department finds that material information and access needed to determine the District's compliance with Title IX and FERPA was intentionally withheld from the

Department by the District in this investigation, in violation of 34 C.F.R. §§ 99.62, 100.6, 106.4, and 106.81.

## IV. The Department Finds that Kansas City Kansas Public Schools, USD 500, is Noncompliant with Title IX and its Implementing Regulations with Regard to Restrooms, Locker Rooms, and Changing Rooms

The Kansas City Kansas Public Schools, USD 500 uses a guidance document that permits boys to invade girls' intimate facilities, endangering girls' safety, privacy, and dignity, whenever a male student asserts he is a girl, notwithstanding real and relevant biological differences between the sexes. The evidence establishes that the Kansas City Kansas' guidance document violates Title IX, 20 U.S.C. § 1681(a), and its implementing regulation 34 C.F.R. § 106.33 (permitting segregation of intimate facilities by sex, not identity).

When a recipient of federal funding separates restrooms, locker rooms, and changing rooms based on sex, the recipient is not unlawfully "discriminat[ing]" based on sex because the recipient is treating the sexes differently with a sufficient justification: the real biological and privacy-based differences between men and women. But when a recipient purports to separate such intimate facilities based on sex and also allows males with a certain "gender identity" to use the women's facilities, that undermines the recipient's justification for different treatment based on sex because the recipient is segregating based on sex without any biological justification for doing so. Accordingly, they are illegally discriminating based on sex, without a valid basis under Title IX.

Here, the Kansas City Kansas Public Schools has purported to provide sex-separate intimate facilities in its schools, but the District's guidance allowing students to use sex-separated restrooms based on the student's "gender identity" abandons the biological justification for sex separation in intimate facilities by allowing males who identify as girls or women to use the women's restroom, locker room, or changing room. Consequently, the school district is discriminating based on sex by separating the sexes without a valid basis under Title IX, and thus is in violation of Title IX. 20 U.S.C. § 1681(a).

Further, as explained above, 34 C.F.R. § 106.33 authorizes recipients to segregate intimate facilities based on sex, not "gender identity." A recipient that designates separate intimate facilities for males and females and then permits men and boys to access the women's and girls' facilities thus violates Title IX. In so doing, the recipient also facilitates the repeated violation of the privacy and dignity of its students. *See Adams*, 57 F.4th at 804-05; *Grimm*, 972 F.3d at 634-36 (4th Cir. 2020) (Niemeyer, J., dissenting). Indeed, the Kansas City Kansas Public Schools' guidance imposes on students the very harms that § 106.33 was intended to prevent.

Recipients have an obligation under Title IX to all students in the provision of restrooms, locker rooms, and changing rooms. Students in school have enough to worry about; worrying about whether it is safe to use the bathroom or change in a locker room, cannot be among them. *See, e.g.*, *Women's Sports Pol'y Working Grp., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes*, https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/ ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

Women and girls have a privacy interest in using intimate facilities away from men and boys, and in shielding their bodies from the opposite sex while using the restroom or changing in the locker room. Those same privacy interests apply to men and boys. "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805. Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05.

It is noted that the Kansas legislature recently overrode Governor Laura Kelly's veto of House Substitute for Senate Bill 244, and that new law went into effect February 26, 2026. House Substitute for Senate Bill 244 requires individuals to use restrooms, locker rooms, and changing rooms located in public facilities that correspond with the individual's sex, which appears to conform to the requirements of Title IX. However, the Kansas City Kansas Public Schools' failure to repeal their conflicting guidance documents and to adopt a policy affirmatively stating the District will comply with Title IX, sends a clear message to students, school staff, the public, and the Department, that the Kansas City Kansas Public Schools intends to perpetuate its unlawful discrimination against female students in the provision of restrooms, locker rooms, and changing rooms.

When recipients allow students to use locker rooms, restrooms, and changing rooms designated for the opposite sex based on "gender identity," they are violating the privacy, safety, and dignitary interests of female students and are facilitating the significant deleterious effects—including discomfort, embarrassment, psychological harm, and potential physical injury—that Title IX seeks to prevent, and heighten the risk and likelihood of sexual harassment which results in a denial of the overall benefits of an education program or activity based on sex, in violation of Title IX, including 20 U.S.C. § 1681(a), and 34 C.F.R. §§ 106.31, 106.33.

## V. The Department Finds that Kansas City Kansas Public Schools, USD 500, is Noncompliant with Title IX and its Implementing Regulations with Regard to Interscholastic Athletics and Intramural Sports.

Kansas City Kansas Schools' guidance regarding interscholastic athletics and intramural sports, are facial violations of Title IX by unlawfully discriminating against girls in violation of 20 U.S.C. § 1681(a); 34 C.F.R. § 106.41(a) (and outside the exception created by 34 C.F.R. § 106.41(b)), and by denying girls the equal opportunity in athletics guaranteed by 34 C.F.R. § 106.41(c).

When a recipient of federal funding separates sports based on sex, the recipient is not unlawfully "discriminat[ing]" based on sex because the recipient is treating the sexes differently with a sufficient justification: the real biological differences between boys and girls. But when the recipient purports to separate sports based on sex and also has guidance that allows males with a certain "gender identity" to participate in girls' sports, that undermines the recipient's justification for different treatment based on sex, because such recipients are segregating based on sex without any biological justification for doing so. Accordingly, they are illegally discriminating based on sex, without a valid basis under Title IX.

Here, the *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School* and the *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document* have abandoned the biological justification for sex separation in athletics by allowing males who identify as girls or women to participate in girls' sports, so the school district is discriminating based on sex by separating the sexes without a valid basis under Title IX, and thus is in violation of Title IX. 20 U.S.C. §§ 1681(a) and (b).

Title IX's athletics regulation—which is a contemporaneous and accurate interpretation of Title IX that has been endorsed by Congress, see *Loper Bright*, 603 U.S. at 394; *Grove City*, 465 U.S. at 568—also shows that the Kansas City Kansas Public Schools' guidance violates Title IX. That regulation first sets out a "[g]eneral" rule prohibiting sex-separated teams: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). It then lays out the only circumstance where recipients may have "[s]eparate teams": "Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id*. § 106.41(b). Still, "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." *Id.*

The Kansas City Kansas Public Schools' guidance discriminates against female student athletes by permitting male students to compete in all-female athletic programs. As explained above, the Title IX regulations explicitly prohibit such discrimination, barring recipients from excluding or otherwise discriminating against members of one sex in their participation in the recipient's athletic program. 34 C.F.R. § 106.41(a). The regulations exempt from that prohibition athletics teams "where selection for such teams is based upon competitive skill" but only to the extent that such segregation is truly on the basis of sex. 34 C.F.R. § 106.41(b). But under the Kansas City Kansas Public Schools' guidance documents, the school district is not segregating athletics exclusively based on sex: Though the school district purports to have male and female teams, the teams are not "for members of each sex," because the District's guidance allows males with a certain "gender identity" to participate on the girls' team, which violates 34 C.F.R. § 106.41(b). The Title IX regulations, on their face, do not permit segregation based on "gender identity." And, as explained above, segregation in athletics based on "gender identity" does not help create fair competition for the members of each sex. To the contrary: allowing males to compete against females in sports designated for girls undermines fair competition for girls.

The Kansas City Kansas Public Schools' guidance also violates the equal opportunity in athletics mandate in the Title IX regulations: "A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). Recipients that provide athletic teams for men and boys are therefore required to provide corresponding athletic teams that are, in fact, open only to biological women and girls. But the District's guidance purports to have opened up women's and girls' athletics to men and boys, where if implemented, would subject female athletes to increased risk of injury, displace them from podiums in athletic competitions, deny them

opportunities for advancement to regional, state, and national competitions, and cause them to miss out on critical visibility for future opportunities and recognition.

One of the factors that OCR considers in deciding whether members of a particular sex have been deprived equal athletic opportunity is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1). OCR "considers the effective accommodation of interests and abilities in conjunction with equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes to determine whether an institution provides equal athletic opportunity as required by Title IX." *Berndsen v. N. Dakota Univ. Sys*., 7 F.4th 782, 788 (8th Cir. 2021) (citing Office for Civil Rights, *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996)).[28] The Kansas City Kansas Public Schools' guidance eliminates the availability of all-girl athletic programs with no alternative to replace the educational benefit for girls that it previously provided for decades. That is simply unacceptable, and it violates Title IX.

The Kansas City Kansas Public Schools' policy and guidance regarding interscholastic athletics appears to conflict, but the District has failed to provide any information to clarify the contradiction. The District's published policy regarding interscholastic athletics is found in policy JH Student Activities.[29] Policy JH states, in relevant part, that any student meeting the eligibility requirements of the Kansas State High School Activity Association (KSHSAA) shall be permitted to participate in the activity. The Department was unable to locate any other policies or guidance the District has regarding student participation in athletics beyond the *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School* and the *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document*.

The *USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document* includes a procedural provision including a student's athletic coaches in the gender support plan described in the guidance document, so it is assumed this guidance anticipates student participation in athletics based on "gender identity," instead of the student's sex. Additionally, the *Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School* specifically states:

> Transgender and gender nonconforming students *shall be permitted to participate in interscholastic athletics in a manner consistent with their gender identity and in compliance with the rules and regulations of the Kansas State High School Activities Association.*

Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-conforming Students at School.

The District argues that since the District complies with KSHSAA eligibility criteria, the District must be considered to be in compliance with Title IX. The Department acknowledges that in April 2023, the Kansas Legislature overrode Governor Laura Kelly's veto of the *Fairness in Women's Sports Act*, K.S.A. 60-5601 *et seq*., which went into effect July 1, 2023. The *Fairness in Women's Sports Act* prompted the KSHSAA to amend their policy relating to male students

---

[28] The Policy Interpretation applies to both intercollegiate and interscholastic athletics. 44 Fed. Reg. at 71,413.

[29] https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=9PFR7N69C053

competing in interscholastic athletics. The *Fairness in Women's Sports Act* appears to conform to the requirements of Title IX, as do portions of the KSHSAA revised policy. However, portions of the revised KSHSAA policy permits participation in some KSHSAA events based on a student's "gender identity," the District has not developed or implemented a policy affirmatively stating that it will not follow KSHSAA policies that result in the district's violation of Title IX, it has not repealed its guidance documents regarding "transgender" students, and it has not adopted a policy stating the District will comply with Title IX.

## VI. The Department and SPPO Finds that Kansas City Kansas Public Schools, USD 500, is Noncompliant with FERPA

The Kansas City Kansas Public Schools, USD 500, receives Federal funding from the U.S. Department of Education and is an "educational agenc[ies]" and "institution[s]" under FERPA. 20 U.S.C. §1232g(a)(1)(A). Accordingly, they are prohibited from having a "policy of denying" or "effectively prevent[ing]" parents from "inspect[ing] and review[ing] the education records of their children." As stated above, our investigation focused on whether the District has a policy that interferes with the right of parents to inspect and review their minor children's education records. Specifically, the District policy[30] states:

> School personnel should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others, *including parents* and other school personnel, unless legally required to do so or unless the student has authorized such disclosure" (emphasis added).

While the inclusion of "unless legally required to do so" may be interpreted to imply some deference for other factors that could include federal laws such as FERPA, the policy could be interpreted to give school officials discretion that would ultimately infringe on the rights of a parent under FERPA. This type of scenario is addressed in U.S. Secretary of Education Linda McMahon's cover letter[31] that included the following strong reminder to state and local education authorities:

> By natural right and moral authority, parents are the primary protectors of their children. Yet many states and school districts have enacted policies that presume children need protection from their parents. Often, such policies evade or misapply [FERPA], turning the concept of privacy on its head to facilitate ideological indoctrination in a school environment without parental interference or even involvement. Going forward, the Department of Education will insist that schools apply FERPA correctly to uphold, not thwart, parents' rights.

In determining whether the facts of a case indicate that a violation of FERPA occurred, SPPO considers all documentation acquired through the investigatory process, in conjunction with the relevant statutory and regulatory requirements and the Department's interpretation of those

---

[30] https://go.boarddocs.com/ks/kckps/Board.nsf/files/AR8NN95EEAD2/$file/District%20Transgender%20Guidelines.6.7.17.pdf

[31] https://studentprivacy.ed.gov/resources/cover-letters-departments-annual-notices-seas-and-leas

requirements. As of the date of this letter of finding, the District has failed to provide SPPO with substantive documentation proving our allegation is without merit or demonstrating that messaging has been issued throughout the District to affirm its compliance with FERPA. Accordingly, in the absence of such documentation, SPPO finds the District in violation of FERPA as alleged. Where we find an educational agency or institution to be in violation of FERPA, we require the submission of written assurances delineating the corrective actions it will take to ensure compliance. We have outlined the corrective actions needed to resolve this investigation in the enclosed Resolution Agreement.

## VII. Duty to Remedy Past Discrimination

Title IX and its implementing regulations require recipients to commit to taking whatever remedial action is necessary to eliminate existing discrimination on the basis of sex and to eliminate the effects of past discrimination, whether occurring before or after the recipient's request for federal financial assistance. *See* 34 C.F.R. § 106.4(a). This investigation has shown the Kansas City Kansas Public Schools, USD 500, has discriminated against female students with its guidance regarding intimate facilities, interscholastic athletics, intramural sports, and FERPA compliance. Accordingly, the Kansas City Kansas Public Schools, USD 500, is obligated to remedy the effects of that past discrimination and to take action to prevent additional discrimination. 34 C.F.R. § 106.4. Furthermore, this investigation has shown that the Kansas City Kansas Public Schools, USD 500, has intentionally denied the Department access to sources of information necessary to determine the recipient's compliance with Title IX and FERPA, in violation of 34 C.F.R. §§ 99.62, 100.6, 106.4, and 106.81. Accordingly, the Kansas City Kansas Public Schools, USD 500, is obligated to remedy the denial of access and provide the information sought by the Department forthwith.

## VIII. Conclusion

This concludes the Department's investigation. This letter of finding identifying areas of noncompliance should not be interpreted to address the Kansas City Kansas Public Schools' compliance with any other statutory or regulatory provision, or to address any issues other than those addressed in this letter. This letter of findings does not constitute final agency action.

This letter sets forth the Department's determination in an individual case. This letter is not a formal statement of Department policy and should not be relied on, cited, or construed as such. Formal policy statements are approved by a duly authorized Department official and made available to the public.

This letter is accompanied by a proposed Resolution Agreement that specifies actions that will remedy current and past discrimination, address compliance concerns expressed above, and prevent any similar instances where future violative conduct may recur. If the Department determines an agreement will not be reached, the Department may begin enforcement action procedures including referral to the U.S. Department of Justice or other means authorized by law, such as the initiation of an administrative procedure to suspend, terminate, or refuse to grant or continue federal financial assistance.

The recipient must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation

enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If the Department receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Respectfully,

BRADLEY BURKE Digitally signed by BRADLEY BURKE Date: 2026.04.17 14:33:48 -05'00'

Bradley R. Burke
Regional Director
Office for Civil Rights

and

FRANK MILLER Digitally signed by FRANK MILLER Date: 2026.04.17 15:16:43 -04'00'

Frank E. Miller, Jr.
Director
Student Privacy Policy Office

Enclosure

**EXHIBIT P**

September 19, 2025

**Sent Via Email: Bradley.Burke@ed.gov and Frank.E.Miller@ed.gov**
Bradley R. Burke
Regional Director
Office for Civil Rights
U.S. Department of Education

Frank E. Miller
Acting Director
Student Privacy Policy Office
U.S. Department of Education

**RE: OCR Case Nos. 07251501, 07251502, 07251503, 07251504**
**SPPO Case Nos. 25-0738, 25-0737, 25-0739, 25-0704**

**School Districts' Request for Meeting to Explore Voluntary Resolution and Response to Data Request**

Dear Mr. Burke and Mr. Miller,

The Kansas City, Kansas School District U.S.D. 500, Olathe Public Schools U.S.D. 233, Shawnee Mission School District U.S.D. 512, and Topeka School District U.S.D. 501 (collectively referred to herein as the "School Districts") jointly request a meeting with you to explore voluntary resolution. In Attachment A to this letter, the School Districts provide initial responses to the Data Request in the above-referenced cases.

**Request for Mediation or Resolution**

In reviewing the Data Request, we note that the U.S. Department of Education (Department) is subject to statutory provisions stating that it shall take no action until it "has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by **voluntary** means."[1] Further, the Department "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and **shall provide assistance and guidance to recipients to help them comply voluntarily** with this part."[2] Seeking voluntary compliance serves many purposes -- it facilitates faster, more efficient, and more satisfactory resolutions to disputes, while building trust and avoiding the adversarial nature

[1] Sec. 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d-1 (emphasis added).
[2] 34 C.F.R. § 100.6(a).

and high costs of formal proceeding; this is critical to improve government efficiency, to save taxpayers money, to expedite compliance, and ultimately to better serve our students. The importance of voluntary resolution is reflected in OCR's Case Processing Manual regarding mediation (Section 201) and voluntary resolution agreements (Section 302).[3] Thus, the School Districts request a meeting with you both to facilitate voluntary resolution of the following three pending issues.

Before providing our response to the Data Request, we thought it would be helpful to identify and address the three issues set forth in the Department's August 14, 2025 letters identifying compliance concerns related to:

(1) Male students participating in interscholastic and intramural athletic programs designated for female students, consistent with Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its implementing regulation 34 C.F.R. Part 106 (Title IX);

(2) Transgender students accessing restrooms and locker rooms consistent with their gender identity, under Title IX; and

(3) School staff disclosing a student's transgender status to the student's parents, under the Family Educational Rights and Privacy Act (FERPA).

After addressing each of the Department's three concerns below, we provide additional information that clearly explains why a meeting would be extremely important and necessary here. Specifically, we acknowledge that – (1) we are willing to proceed with either mediation or a meeting to explore voluntary resolution (as the Department deems appropriate), (2) the nature of the applicable case law under Title IX, (3) the importance of an oral, interactive discussion regarding the Schools Districts' policy, procedure, or guidance documents, and (4) how our response to your Data Request may need to be updated once we receive the information we requested from the Department. We welcome the opportunity to discuss these issues in addition to the Department's three concerns.

(1) <u>Student Participation in Interscholastic and Intramural Programs</u>

As outlined below (and previously referenced in the School Districts' August 29, 2025, letter to Mr. Burke (OCR)), the School Districts are in compliance with their state athletic association, the Kansas State High Schools Athletics Association (KSHSAA), policy regarding transgender students' participation in athletics and activities. This policy expressly

---

[3] See, U.S. Department of Education, OCR, Case Processing Manual – February 19, 2025(PDF).

states that “Kansas interscholastic activities under the jurisdiction of the KSHSAA shall be expressly designated as one of the following based on biological sex: 1. Males, men, or boys, 2. females, women, or girls; or 3. coed or mixed. Athletic teams or sports designated for females, women or girls shall not be open to students of the male sex.”[4] As KSHSAA members, the School Districts are reiterating that they must, and do, comply with this participation policy.

Additionally, each School District has, respectively, adopted policies requiring compliance with KSHSAA’s policies. For example, Olathe Public Schools has agreed to “adhere to the policies, guidelines and procedures and governance of” KSHSAA.”[5] Shawnee Mission similarly has a policy stating that “students who participate in any school activity shall meet … all applicable KSHSAA regulations.”[6] KCKPS also requires students to meet “applicable age and eligibility requirements required by KSHSAA.”[7]

The School Districts respectfully note that their compliance with KSHSAA’s “Transgender Student Participation Policy” should resolve the first concern identified by the Department. This is particularly true given the positions that OCR has taken in similar investigations of K-12 school districts[8], the apparent lack of any parent or student in attendance at the School Districts filing a complaint with OCR regarding transgender students’ participation in athletics/activities, and that the School Districts have neither received, nor are aware of, any Title IX complaint as affirmed below in the Data Request response.

(2) Restroom and Locker Room Access

Given the positions that OCR has taken in similar investigations of K-12 school districts, and given statements in OCR’s investigation notice letters to the School Districts, it is clear that OCR is taking the position that school districts act in violation of Title IX when they meet requests by transgender students and their parents to access school facilities that align with their gender identity. The law is unsettled in this area, although most federal courts of appeal have determined that schools must provide equal access to transgender students. The School Districts request that OCR meet with the School Districts to provide assistance and guidance, as supported by existing federal court interpretation of Title IX, regarding

---

[4] A copy of KSHSAA’s “*Transgender Student Participation Policy*” can be found on KSHSAA’s website, https://www.kshsaa.org/Public/PDF/TransgenderPolicyRecommendations.pdf.
[5] See, https://go.boarddocs.com/ks/olathe/Board.nsf/goto?open&id=83DEZJ757D2B.
[6] See, https://go.boarddocs.com/ks/smsd/Board.nsf/goto?open&id=D9USSG7410BB
[7] See, https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=9PFR7N69C053
[8] https://www.ed.gov/about/news/press-release/us-department-of-education-finds-five-northern-virginia-school-districts-violation-of-title-ix;
https://www.ed.gov/about/news/press-release/us-department-of-education-finds-five-northern-virginia-school-districts-violation-of-title-ix

compliance with Title IX as it relates to equal access to restrooms and locker rooms for all students. In particular, the School Districts request a meeting and follow-up with specific written guidance with supporting legal authority under Title IX related to student access to locker rooms and bathrooms based upon a student's gender identity.

(3) Disclosure of Student's Gender Identity

The Department's August 14, 2025 notification letters state that each *"[School] District has a policy that prevents school officials from disclosing a student's 'transgender status' to the student's parents unless authorized by the student, in violation of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and its implementing regulation at 34 C.F.R. Part 99*."

This statement is both confusing and inaccurate. The applicability of FERPA is at best unclear or more likely -- not applicable -- given that the School Districts do not maintain information about gender identity in their education records of students in attendance. The School Districts only maintain information about students' sex (M or F), as recorded on their birth certificate, in their education records of students in attendance. Additionally, the School Districts have no such policies. In stark contrast to the Department's statement, the School Districts have enacted policies ensuring their compliance with FERPA, as noted below in Attachment A in the response to the Data Request.

We respectfully request resolution of this matter as this response addresses any potential FERPA concerns. Given the apparent lack of any parent of a student in attendance at the School Districts filing a complaint with SPPO regarding any alleged denial of access to education records, and given that the School Districts have not received any such FERPA complaint as affirmed below in response to the Data Request, this response should resolve any compliance concerns with respect to disclosure of student's gender identity.

(4) Request for Mediation or Voluntary Resolution

The OCR Case Processing Manual ("CPM") sets forth three different methods for resolution of a complaint: rapid resolution, mediation, and informal resolution. Article II of the CPM specifically addresses mediation of allegations. Article I, Section 110 of the CPM addresses rapid resolution. In light of the information provided above, if OCR wishes to proceed with rapid resolution for a dismissal or resolution letter, we would be glad to discuss these options.

Additionally, the School Districts would be amenable to mediation, however, according to the CPM, the mediation process involves OCR facilitating a discussion and possible

agreement *between a complainant and a recipient*. It is unclear whether mediation is an available option to resolve this matter. However, if it is available, the School Districts remain amenable to mediation should a parent of a student in attendance at the School Districts have filed a complaint. In such a situation, the School Districts request that OCR act as a neutral facilitator and mediate the complaint.

Article III, Section 302 of the CPM addresses resolution agreements during an investigation. Because of the unsettled state of the law regarding Title IX protections for students and the myriad of court decisions enjoining the Department's attempted enforcement actions against recipients, it appears that this investigation would be most appropriate for a voluntary resolution process. Litigation would further consume taxpayer resources and that will neither serve students (whom we all jointly serve as part of our mission) and provide little benefit to either the Department or the School Districts. The School Districts request that OCR initiate voluntary resolution proceedings under CPM Section 302.

Specifically, we welcome the opportunity to meet with you both. If easier, would you please provide a few dates in the next two weeks or, if you prefer, undersigned counsel for the School Districts can email you dates that we are available to explore a resolution discussion.

(5) <u>Applicable Case Law under Title IX</u>

As OCR is well aware, case law has developed in a manner that strongly indicates that transgender students are protected under Title IX and that school districts are legally required to provide equal access to transgender students. The plain language of Title IX does not answer whether transgender students come under its protections. We therefore look to courts to interpret the law. *See Loper Bright Enterprises v. Raimondo* 603 U.S. 369 (2024) (holding that courts may not defer to an agency interpretation of the law simply because a statute is ambiguous, and that the Administrative Procedure Act requires courts to "decide all relevant questions of law").

The vast majority of federal appeals courts that have directly considered whether Title IX protects transgender students have found that excluding these students from facilities (or sports) consistent with their gender identity constitutes unlawful discrimination based on sex, often citing the U.S. Supreme Court precedent in the *Bostock v. Clayton County* case. There is only one federal court of appeals that has determined that Title IX protections do not extend to transgender students and our state, Kansas, is not in that jurisdiction.

As you likely know, the U.S. Supreme Court has yet to decide whether transgender status is a protected class under Title IX, or to determine if cisgender students' Title IX rights can be

violated when equal protection access is provided to transgender students. Most recently, on September 10, 2025, the U.S. Supreme Court denied a request to lift a federal appeals court's injunction order that requires a public school to allow a transgender boy to use the boys' bathroom while he challenges a state law that requires students to use bathrooms based on their biological sex at birth.[9]

(6) School Districts' Policy Documents

The School Districts are providing with this response their respective policy, procedure, or guidance documents regarding transgender students.[10] The School Districts are also providing their respective non-discrimination/non-harassment policies, which ensure compliance with Title IX. The School Districts' position is that their non-discrimination policies, along with their practices with regard to responding to requests by transgender students and their parents, are in compliance with Title IX as it has been interpreted by federal courts.

We welcome a meeting as part of a resolution discussion with OCR and SPPO so that we may fully address, and hopefully resolve, the Department's three compliance concerns as we seek to find a path forward to voluntarily resolve any remaining questions regarding these three concerns.

(7) Response to Data Request Dependent on Receipt of Requested Information

Finally, we must express some frustration with our attempts to obtain additional information, both so that we can be responsive to the Department's Data Request, but more importantly

---

[9] https://www.scotusblog.com/cases/case-files/south-carolina-v-doe/

[10] Olathe Public Schools does not have a policy or documented procedure; however, it does have an informal guidance document, dated 12/2/21, that is provided. Shawnee Mission School District does not have a policy or procedure document. It has an informal living document titled "Transgender Student Practices & FAQs" that is an internal guidance document for school principals that has been updated as principals have raised questions. KCKPS does not have a policy or documented procedure, but has an internal guidance document titled "USD 500 Transgender and Gender Non-Conforming Students Internal Guidance Document", which is provided. Of note, this guidance document is **not** the document linked to your August 14, 2025, letter to KCKPS labeled as "Kansas City Kansas Public Schools Guidelines for Transgender and General Non-Conforming Students at School." As has been communicated repeatedly to the Kansas Attorney General and other inquiring parties, the document linked to your letter is not and has never been adopted, approved or utilized by the KCKPS. Rather, that document was included in a presentation made to KCKPS's Board of Education during an open public meeting on September 18, 2017. At the meeting (as reflected in the publicly available minutes), the Board accepted the report as an information item only and did not and has not ever adopted or approved the referenced "Guidelines for Transgender and Gender Non-Conforming Students at School". This document is only accessible on the district website through BoardDocs, because the document was presented to the Board at that meeting and, therefore, is required to remain part of the Board's public records.

to identify any potential harm to students. We know that our most important mission is to serve our students, and it is this mission that we jointly share. In trying to obtain information from your offices on whether there is any actual or potential harm to a student, we have encountered difficulties, but look forward to addressing any student-specific issues promptly once we receive such information.[11]

We appreciate the time you are taking to carefully review our response. We also appreciate the opportunity to provide additional clarification in a meeting with you to address any outstanding questions or concerns.

Sincerely,

/s/ Counsel for the School Districts:

Kansas City, Kansas School District U.S.D. 500
Greg Goheen, Legal Counsel
ggoheen@mvplaw.com

Olathe School District U.S.D. 233
Chris Pittman, Staff Counsel
capittman@olatheschools.org

Shawnee Mission School District U.S.D. 512
Rachel England, General Counsel
rachelengland@smsd.org

Topeka School District U.S.D. 501
Donna Whiteman, General Counsel
dwhiteman@tps501.org

[11] The August 14, 2025 letters stated the Department had received a complaint alleging that the School Districts have "*a policy, procedure, or guidance …that permits male students to participate in interscholastic and intramural athletic programs designated for female students, and allows students to use restrooms and locker rooms designated for the opposite sex based on a student's 'gender identity [in violation of Title IX].*" and "*a policy that prevents school officials from disclosing a student's 'transgender status' to the student's parents unless authorized by the student, in violation of [FERPA].*"
On August 29, 2025, the School Districts requested the Department provide information about any complaint, complainant, and policies related to its letters. To date, the Department has not provided any information. The Department's response stated only that "*[r]equests for records must be submitted in accordance with [FOIA].*" When the School Districts submitted their September 5, 2025 FOIA request, the Department's September 8, 2025 letter indicated that "*the current average request processing time is 185 business days*." Given that the Department denied the School Districts' request for an extension beyond an additional 14 days, the Department has created a near-impossible situation under which the School Districts must respond to the Data Request without sufficient information. When the School Districts receive responsive information under FOIA, each School District reserves the right to supplement its response to the Data Request within a reasonable time following receipt of such information.

**Attachment A**

School Districts' Response to Data Request in
OCR Case Nos. 07251501, 07251502, 07251503, 07251504 and
SPPO Case Nos. 25-0738, 25-0737, 25-0739, 25-0704

The responses below are, as requested, for school years 2023-2024, 2024-2025, and 2025-2026 (through September 19, 2025).

In response to request nos. 1 and 2, as stated in the School Districts' August 29, 2025 letter, counsel for each School District will be the point of contact. The undersigned counsel provide legal guidance to their respective School Districts on a variety of legal matters, including on compliance with Title IX and other civil rights laws with respect to sex and gender identity. The undersigned counsel have "*information relevant to the issues OCR and SPPO are investigating*."

In response to request no. 10, the undersigned counsel have provided "*guidance … that relates or refers to student participation in sex-separated interscholastic athletic or intramural programs based on a student's 'gender identity' or similar terms*."

In response to request no. 11, the undersigned counsel have provided "*guidance … that relates or refers to utilization of District provided sex-separated restrooms, locker rooms, or changing rooms, based on a student's 'gender identity' or similar terms*."

In response to request no. 27, the undersigned counsel assisted in the preparation of this response. Please note that the undersigned counsel must preserve the attorney-client privilege and attorney work product privilege as it relates to legal guidance given to their clients regarding Title IX and FERPA and as it relates to documents or records prepared in anticipation of litigation with the Department.

If there is any additional non-privileged information or records that OCR requires in response to request nos. 1, 2, 10, 11, or 27, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM).

In response to request no. 3, as stated in the School Districts' August 29, 2025 letter, the School Districts' understanding is that the Department has access to "*a copy of all documentation submitted by the District to the Kansas Department of Education [KSDE] requesting or applying for federal funding, including formula and discretionary grants*." The School Districts further understand that OCR has requested the same documents from KSDE.

If there is any specific funding documentation that OCR is seeking in response to request no. 3 that it does not have access to, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM).

In response to request no. 4, each School District has a Board of Education policy ensuring compliance with FERPA. Those policies are publicly available on each School Districts' website. A link to those policies is provided below.

- Kansas City, Kansas Board Policy JR (Student Records): https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=9PFUX67C4418
- Kansas City, Kansas Board Policy IDAE (Student Privacy Policy): https://go.boarddocs.com/ks/kckps/Board.nsf/goto?open&id=9PH2V57B36D7

- Olathe Board Policy IDAE (Student Privacy): https://go.boarddocs.com/ks/olathe/Board.nsf/goto?open&id=9QU6Z97076AD
- Olathe Board Policy JRB (Release of Student Records): https://go.boarddocs.com/ks/olathe/Board.nsf/goto?open&id=83DEZU757DE2

- Shawnee Mission Board Policy JR (Student Records): https://go.boarddocs.com/ks/smsd/Board.nsf/goto?open&id=9QUARS796A2C
- Shawnee Mission Board Policy IDAE (Student Privacy Policy): https://go.boarddocs.com/ks/smsd/Board.nsf/goto?open&id=CHBL7R55372A

- Topeka Board Policy 8250 (Student Records) and accompanying Regulation 8250-01 (Collecting, Maintaining, and Releasing Information from Student Records): https://cdnsm5-ss11.sharpschool.com/UserFiles/Servers/Server_8252759/File/About%20Us/Policies%20and%20Regulations/8000%20-%20Students/8250.pdf https://cdnsm5-ss11.sharpschool.com/UserFiles/Servers/Server_8252759/File/About%20Us/Policies%20and%20Regulations/8000%20-%20Students/8250-01.pdf
- Topeka Board Policy 8065 (Student Privacy Policy): https://cdnsm5-ss11.sharpschool.com/UserFiles/Servers/Server_8252759/File/FINAL%20Policy%208065%20Oct%206%2022.pdf

The School Districts comply with FERPA, including specifically parents' and eligible students' right to inspect and review their education records and parents' and eligible students' right to request that their education records be amended. The School Districts do not respond to requests to inspect or access education records of students in attendance at the School Districts differently for any parent, including parents of transgender students.

If there is any additional information or records that OCR requires in response to request no. 4, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM).

In response to request nos. 5-8, 12, 14, 16, and 18, all of which relate to interscholastic athletic or intramural programs, as stated in the School Districts' August 29, 2025 letter, the School Districts are all members of the Kansas State High School Activities Association (KSHSAA) and are subject to KSHSAA's policies and rules. Kansas law establishes that the authority and responsibility to regulate, supervise, promote, and develop activities such as athletics, music, forensics, dramatics and any other interschool extracurricular activities by students from grades 7 through 12 lies with KSHSAA.[12] Each of the School Districts' sports/athletic programs and performing arts activities are offered through and sanctioned by KSHSAA. After the Kansas legislature passed the Fairness in Women's Sports Act (K.S.A. §§ 60-5601 *et. seq*) in 2023[13], KSHSAA modified its participation policy. The current KSHSAA policy requires that interscholastic activities "*shall be expressly designated as one of the following based on biological sex: 1. Males, men, or boys, 2. females, women, or girls; or 3. coed or mixed*." The KSHSAA policy is publicly available on its website at: https://www.kshsaa.org/Public/PDF/TransgenderPolicyRecommendations.pdf

The School Districts comply with this KSHSAA participation policy. The School Districts' interscholastic activities are designated as one of the following based on biological sex: 1. Males, men, or boys, 2. females, women, or girls; or 3. coed or mixed. In accordance with the KSHSAA participation policy, the School Districts' athletic teams or sports designated for females, women, or girls are not open to students of the male sex. If, after reviewing the KSHSAA participation policy, OCR determines that any provision of the KSHAA policy would require the School Districts to take action in violation of Title IX, the School Districts request that OCR facilitate a mediation or resolution meeting between OCR, KSHSAA, and the School Districts to discuss any specific provisions of the KSHAA policy that OCR believes is illegal, the specific authority for such position, and possible resolutions.

If there is any additional information or records that OCR requires in response to request nos. 5-8, 12, 14, 16, and 18, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM).

In response to request no. 9, as stated in the School Districts' August 29th letter, the School Districts' school buildings are each outfitted with typical sex-separated restrooms and locker rooms that would be present in any school building or other public building in accordance with 34 C.F.R. § 106.33. The School Districts ensure students and staff have equal access to facilities, and they ensure equivalent quality and availability of athletic facilities.

---

[12] See, KSHSAA enabling statutes at K.S.A. §§ 72-7114 *et seq*.

[13] Note that this Kansas state law has not yet been challenged under Title IX or the Equal Protection Clause. The U.S. Supreme Court decision in the consolidated cases of *Hecox v. Little* and *B.P.J. v. W. Va. State Bd. of Educ.* will determine the legality of state laws barring transgender girls from girl's sports.

If there is any additional information or records that OCR requires in response to request no. 9, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM). Further, OCR is welcome to conduct an onsite inspection of the restrooms and locker room facilities.

In response to request nos. 13, 15, and 17, all of which relate to restrooms, locker rooms, or changing rooms, the School Districts' policy, procedure, or guidance documents are public documents and they are being provided with, and are attached to, this response. The purpose of the School Districts' policy, procedure, or guidance documents is to comply with existing law regarding Title IX as it relates to transgender students.

If, after reviewing these documents, OCR determines that any provision would require the School Districts to take action in violation of Title IX, the School Districts request that a resolution meeting between OCR and the School Districts to discuss any potential specific provisions of the documents that OCR believes would be illegal and the specific authority for its opinion, as well as any proposed alternative language.

If there is any additional information or records that OCR requires in response to request nos. 13, 15, or 17, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM).

In response to requests no. 19-23 and 25, all of which relate to complaints or incidents of alleged failure to comply with practices for accommodating transgender students, each of the School Districts has a Board of Education policy affirming compliance with Title IX and setting forth a grievance procedure for formal Title IX complaints that complies with the Department's 2020 regulations. The School Districts' designated Title IX compliance coordinators have not received any formal complaints alleging a Title IX violation related to transgender students' participation in athletics/activities and/or to transgender students' access to restrooms/locker rooms/changing rooms.  In accordance with 34 C.F.R. § 106.45(b)(vi), the School Districts' respective non-discrimination/Title IX policies set forth appropriate remedies, including appropriate disciplinary sanctions, that may be taken if a determination is made that conduct which violated Title IX occurred.

As stated in the School Districts' August 29th letter, the School Districts have not been notified of any parent complaint alleging failure to provide access to education records (or failure to comply with any other parent right afforded under FERPA) that has been filed with the SPPO or any other entity.  The School Districts have asked the Department to identify any complainants or individual students for which a Title IX or FERPA complaint has been filed, so that they can search for responsive records.  Without the identity of a complaint or specific student, the School Districts have no ability to search for any records or correspondence concerning any informal complaints.  Again, the School Districts stress that they have received no formal complaints under their Title IX non-discrimination/

non-harassment policies related to equal access and transgender students, nor have they received any parent FERPA complaints related to transgender students.

If there is any additional information or records that OCR requires in response to request nos. 19-23 and 25, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM).

In response to request no. 24, the School Districts state that they have never “charged a fee to a parent to search for or to retrieve … any records related to a student’s gender transition status or plan or related accommodations.” The School Districts have asked OCR/SPPO to identify any complainants or individual parents for which a FERPA complaint has been filed, so that they can search for responsive records. Without the identity of a complainant or specific parent, the School Districts have no ability to search for any records or correspondence concerning any informal complaints.

In response to request no. 26, the School Districts seek clarification regarding the “communications” that OCR is requesting. The School Districts have provided two communications to OCR regarding this investigation: their August 29, 2025 letter and this letter.

If there is any additional non-privileged information or records that OCR requires in response to request no. 26, the School Districts shall make such documents available onsite to OCR representatives (in accordance with section 702(c)(3) of the CPM).

In response to requests no. 28 and 29, the School Districts refer OCR to their request for a meeting for the purpose of voluntary resolution.

**United States Department of Education**

Office of the Deputy Secretary

FOIA Service Center

September 8, 2025

EXHIBIT
Q

Gregory Goheen
MVP Law
10 E. Cambridge Circle Drive,
Suite 300
Kansas City, KS 66103

RE: FOIA Request No. 25-04814-F

Fee Waiver Requested: No
Expedited Processing Requested: No

Dear Gregory Goheen:

This is an acknowledgment of your request for information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, dated September 5, 2025, and received in the Department of Education's (Department) FOIA Service Center (FSC) on September 8, 2025. You requested the following:

"Any and all complaints or communications alleging a violation of civil rights laws, including Title IX, FERPA, or other laws received by the U.S. Department of Education Office for Civil Rights and/or Student Privacy Policy Office since August 1, 2023 concerning Kansas City, Kansas School District U.S.D. 500, Olathe School District U.S.D. 233, Shawnee Mission School District U.S.D. 512, and/or Topeka School District U.S.D. 501."

Please review the Additional Information section below to learn if we need additional clarification and/or documentation in order to continue processing your request. **If no additional information is needed, nothing more is required from you at this time.** If we do require supplemental information, you have ten business days to respond. If you do not respond within this time frame, we will administratively close your case. An administrative closure is not a denial of your request and does not preclude you from making requests in the future.

Please be advised that the current average request processing time is 185 business days. If you have any questions, please contact the FSC at 202-401-8365 or EDFOIAManager@ed.gov. You may also check the status of your request at https://doed.secureocp.com/app/CheckStatus.aspx.

Additional Information

No additional information is needed at this time. However, we will contact you if, in the future, any additional information is needed in order to complete our search for documents.

Fees and Expedited Processing

There are currently no fees associated with this request. If we determine that a fee assessment is necessary, we will provide you with a fee estimate and the status of your requester category. If you requested a fee waiver and we determine a fee assessment is necessary, we will include our determination along with the fee estimate.

Additional Assistance

You have the right to seek assistance and/or dispute resolution services from the Department's FOIA Public Liaison or the Office of Government Information Services (OGIS). The FOIA Public Liaison is responsible, among other duties, for assisting in the resolution of FOIA disputes. OGIS, which is outside the Department, offers ombuds services, including dispute resolution, to assist FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Please note, OGIS's assistance does not replace the administrative appeal process described below. You may contact the FOIA Public Liaison or OGIS at:

FOIA Public Liaison
Office of the Deputy Secretary
U.S. Department of Education
400 Maryland Ave., SW, LBJ 7W104
Washington, DC 20202-4500
Email: robert.wehausen@ed.gov
Phone: 202-205-0733
Fax: 202-401-0920

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road, OGIS
College Park, MD 20740-6001
Email: OGIS@nara.gov
Phone: 202-741-5770 or 1-877-684-6448

If expedited processing and/or a fee waiver was requested and denied, you have the right to appeal the Department's decision by submitting an appeal to the address below, no later than 90 calendar days from the date of this letter. Using the FOIA Public Liaison or OGIS services described above does not affect your right or the deadline to file an appeal. Your appeal must be in writing and must include a detailed statement of all legal and factual bases for the appeal. It should be accompanied by this letter, a copy of your initial letter of request, and any documentation that supports the argument you wish the Department to consider in

making an administrative determination on your appeal. You may submit your appeal by:

Mail: Appeals Office
Office of the Deputy Secretary
U.S. Department of Education
400 Maryland Avenue, SW, LBJ 7W104
Washington, DC 20202-4536

Online Form: www.ed.gov/policy/gen/leg/foia/foia-appeal-form.pdf

E-mail: EDFOIAappeals@ed.gov

Fax: 202-401-0920

Sincerely,

ED FOIA Service Center

Office of the Deputy Secretary

**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF THE SECRETARY**
Freedom of Information Act (FOIA) Service Center

**EXHIBIT R**

**FOIA REQUEST FORM**

Use this form to request U.S. Department of Education records/information. Submit completed form and documentation via email: EDFOIAManager@ed.gov; fax 202-401-0920; or mail to U.S. Department of Education, Office of the Secretary, 400 Maryland Avenue, SW, LBJ 7W106, Washington, DC 20202-0121, Attn: FOIA Public Liaison.

## REQUESTER INFORMATION

**Title** Mr. **First Name** Gregory **M.I.** P **Last Name** Goheen

**Business Name** McAnany Van Cleave & Phillips **Title**

**Address** 10 E Cambridge Circle Drive **Bldg/Apt#** Suite 300

**City** Kansas City **State** KS **Zipcode** 66103

**Phone Number** 913.371.3838 **Fax Number** 913.371.4722 **Email** ggoheen@mvplaw.com

**Requester Description**

- ☒ An individual seeking information for personal use.
- ☐ Affiliated with a private corporation and seeking information for use in the company's business.
- ☐ A representative of the news media/press and this request is made as part of news gathering and not for commercial use.
- ☐ Affiliated with a public interest group and this request is not for commercial use.
- ☐ Affiliated with an educational or noncommercial scientific institution and this request is for a scholarly purposes.
  - Provide a description of the scholarly purpose the requested documents support.
  - If the scholarly purpose is currently funded by the Department of Education, provide funding numbers and award name.
  - If the documents requested are to increase the possibility of receiving a grant or contract to conduct a scholarly purpose, then the purpose of the request is commercial.

**Comments** (i.g. media agency, description of scholarly purpose)

Requester is an attorney submitting this request on behalf of 4 Kansas public school districts: (Kansas City, Kansas School District U.S.D. 500, Olathe School District U.S.D. 233, Shawnee Mission School District U.S.D. 512, and Topeka School District U.S.D. 501) to aid in providing responses to Data Requests from the U.S. Department of Education Office for Civil Rights.

**Description of documents that are being requested.** Be as specific as possible with regard to names, dates, places, events, subjects, etc. If known, you should include any file designations or descriptions for the records that you are requesting.

Any and all complaints or communications alleging a violation of civil rights laws, including Title IX, FERPA, or other laws received by the U.S. Department of Education Office for Civil Rights and/or Student Privacy Policy Office since August 1, 2023 concerning Kansas City, Kansas School District U.S.D. 500, Olathe School District U.S.D. 233, Shawnee Mission School District U.S.D. 512, and/or Topeka School District U.S.D. 501.

## FEES AND FEE WAIVERS

- [x] I agree to pay all applicable fees. *(To view the fee structure, visit: http://www2.ed.gov/policy/gen/leg/foia/fees.html)*
- [ ] I request a waiver or reduction of fees.
  *(To view the criteria for fee waivers, visit: http://www2.ed.gov/policy/gen/leg/foia/fee-waiver.html)*
- [ ] Enter a specified amount which you agree to pay. I understand I will be notified if the estimated cost exceeds the specified amount I provided. *(Note: The Department does not charge for request which total $25 or less.)*

## EXPEDITED PROCESSING

If you are requesting expedited processing, choose the appropriate rationale for your request below.

- [x] Failure to obtain requested records could reasonably be expected to pose an imminent threat to the life or physical safety of an individual. Additionally, if immediate use of the FOIA is shown to be critical (as opposed to a mere allegation) to the preservation of a substantial right that fact may also be considered.

**Explain**

Requester needs the requested records by no later than Friday, September 12, 2025. OCR has set a response deadline for the 4 Kansas Public School Districts Data Requests of September 19, 2025.

- [ ] Request made by a person primarily engaged in disseminating information and there is an urgency to inform the public concerning actual or alleged Federal Government activity (this option available ONLY for requesters primarily engaged in disseminating information).

**Explain**

## ADDITIONAL COMMENTS

**Additional Comments**

---

***Privacy Act Statement:***

**AUTHORITY:** 5 U.S.C. 301, Departmental Regulations and 5 U.S.C. 552, Freedom of Information Act (FOIA).

**PURPOSE:** to allow individuals to file electronic FOIA requests; to track all FOIA requests from receipt to response to compile statistics for the Annual FOIA Report; to research and respond to FOIA requests; to maintain case files to comply with records disposal requirements; and to maintain an administrative record to support any litigation.

**ROUTINE USE:** Requests are received, assigned a case number, routed to the appropriate office or organization for research and response, and filed in a case file. Requests that are transferred, receive a no records response, or granted in full are retained for 2 years and then destroyed. Requests that are denied in whole or in part are retained for 6 years then destroyed.

**DISCLOSURE:** Voluntary. We seek your full name and postal mailing address so we may mail a response to you. Failure to provide this information may result in your request not being processed (this page does not capture email addresses).

Information collected by this form is also used for trend analysis and may be shared with law enforcement personnel. Information submitted may be retained indefinitely.

UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON, D.C. 20202

September 3, 2025

EXHIBIT
S

Dr. Anna Stubblefield
Superintendent of Schools
Kansas City Kansas Public Schools, U.S.D. 500
2010 N. 59th Street
Kansas City, KS 66104
OCR Case No. 07251501, SPPO Case No. 25-0738
Sent via email only, to: ggoheen@mvplaw.com

Dr. Brent Yeager
Superintendent of Schools
Olathe Public Schools, U.S.D. 233
14160 Black Bob Road
P.O. Box 2000
Olathe, KS 66063
OCR Case No. 07251502, SPPO Case No. 25-0737
Sent via email only, to: capittman@olatheschools.org

Dr. Michael Schumacher
Superintendent of Schools
Shawnee Mission School District, U.S.D. 512
8200 W. 71st Street,
Shawnee Mission, KS 66204
OCR Case No. 07251503, SPPO Case No. 25-0739
Sent via email only, to: rachelengland@smsd.org

Dr. Tiffany Anderson
Superintendent
Topeka Public Schools, U.S.D. 501
624 S.W. 24th Street
Topeka, KS 66611
OCR Case No. 07251504, SPPO Case No. 25-0704
Sent via email only, to: dwhiteman@tps501.org

Re: August 29, 2025, Requests for Extension of Time to Respond to Data Requests and for Clarification regarding Data Requests

Dear Dr. Stubblefield, Dr. Yeager, Dr. Schumacher, and Dr. Anderson:

The United States Department of Education (Department), Office for Civil Rights (OCR) and Student Privacy Policy Office (SPPO), writes in response to the school districts' joint letter as submitted through legal counsel dated August 29, 2025, in which you request: (1) 90 additional days to provide the information requested in the August 22, 2025, OCR and SPPO

Data Request; (2) "clarification" on the Department's authority to request the information requested in the OCR and SPPO Data Request; (3) "clarification" on what the Department is investigating; and (4) "clarification" on how the information requested is relevant to the Department's investigation; (5) You also appear to be making a request for certain records.

*(1) Request for Additional Time.*

Your request for additional time to provide the requested information is granted, in part. The Department has already given the school districts 14 days to provide the requested data. **The Department is willing to extend the deadline an additional 14 days to the close of business September 19, 2025.** Please be aware the Department sent a SharePoint link to each counsel listed in this letter and each Superintendent on August 28, 2025, after not receiving a response by the August 27, 2025, deadline indicated in the Data Request letter. The school districts are on notice that failure to provide the requested information by **September 19, 2025,** may be considered a refusal of access, and the Department may initiate proceedings to enforce the Department's rights under law, and/or take other steps available to the Department under law.

*(2) "Clarification" on the Department's authority to request the information requested in the OCR and SPPO Data Request.*

As recipients of federal financial assistance from the Department, the school districts are required to provide OCR and SPPO access to sources of information that may be pertinent to ascertain compliance with Title IX and FERPA, respectively. As stated in the Notification Letter, OCR's Kansas City enforcement office will lead the Title IX investigation, while SPPO will lead the FERPA investigation. That authority has already been provided to the districts in the Notification Letter and Data Request and need not be restated.

*(3) "Clarification" on what the Department is investigating.*

The issues being investigated by the Department have already been provided to the school districts in the Notification Letter and need not be restated.

*(4) "Clarification" on how the information requested is relevant to the Department's investigation.*

The Department has properly notified each school district of the issues to be investigated, the Department's jurisdiction, and the information needed to help determine compliance. The Department is not required to provide further justification or explanation to the school districts for the information federal law requires the school districts to provide.

*(5) Request for Department Records.*

The school districts appear to make several requests for federal records. Requests for records must be submitted in accordance with 34 C.F.R. Part 5 and 5 U.S.C. § 552. FOIA requests and appeals may be submitted online; faxed to: (202) 401-0920; or mailed to: U.S.

Department of Education, Office of the Deputy Secretary, FOIA Service Center, 400 Maryland Avenue, SW, LBJ 7W106A, Washington, DC 20202-4536, ATTN: FOIA Public Liaison.

If any of the school districts would like to discuss the investigation, please reach out to us at Bradley.Burke@ed.gov and Frank.E.Miller@ed.gov to schedule a call.

Respectfully,

BRADLEY BURKE Digitally signed by BRADLEY BURKE Date: 2025.09.03 16:02:16 -05'00'

Bradley R. Burke
Regional Director
Office for Civil Rights

Digitally signed by FRANK MILLER Date: 2025.09.03 16:54:08 -04'00'

Frank E. Miller Jr.
Acting Director
Student Privacy Policy Office

August 29, 2025

**EXHIBIT**
**T**

**<u>Sent Via Email: Bradley.Burke@ed.gov</u>**
Bradley R. Burke
Regional Director
Office for Civil Rights
U.S. Department of Education

**RE: OCR Case Nos. 07251501, 07251502, 07251503, 07251504**
**SPPO Case Nos. 25-0738, 25-0737, 25-0739, 25-0704**

**Requests for Extension of Time to Respond to Data Requests and for Clarification regarding Data Requests**

Mr. Burke,

Kansas City, Kansas School District U.S.D. 500, Olathe School District U.S.D. 233, Shawnee Mission School District U.S.D. 512, and Topeka School District U.S.D. 501 (collectively referred to herein as the "School Districts") are in receipt of the Data Requests that the Office for Civil Rights emailed to the respective superintendents on August 22, 2025. Because the School Districts received nearly identical investigation notice letters and Data Requests, this letter is provided jointly to efficiently address certain items in your letter and accompanying Data Requests.

The School Districts are unable to submit a response to the Data Requests within the nine business day deadline set forth in your August 22nd letter. Further, the School Districts also require additional time and clarification on multiple points in order to respond with fidelity to the Data Requests. Consequently, the School Districts request that OCR provide up to 90 additional days for submission of their responses to the Data Requests, with the 90-day timeline to begin running after sufficient clarification has been provided to enable the School Districts to understand what information OCR is seeking as well as pursuant to what authority OCR is seeking such information.

In your letter you requested a point of contact for this investigation and "*the individual authorized by the District to resolve any concerns identified or findings of noncompliance*." The undersigned counsel for each School District will be the point of contact. Additionally, you can grant access to each undersigned counsel to the SharePoint site.

With respect to OCR's Data Requests regarding guidance the School Districts have received, the undersigned counsel provide legal guidance to their respective School Districts on a variety of legal matters, including on compliance with Title IX and other civil rights laws with respect to sex and gender identity.

Your August 22nd letter to the School Districts indicates: "*If you have any questions regarding this Data Request relating to Title IX, please contact Bradley.Burke@ed.gov, or relating to FERPA, please contact FERPA.ComplaintResponse@ed.gov.*" Further, the Data Requests issued by OCR appear to seek information regarding both compliance with FERPA and with Title IX. This duality raises questions for the School Districts regarding the distinction between what exact issue(s)/complaint(s) are being investigated by OCR, and what exact issue(s)/complaint(s) are being investigated by SPPO.

As you are aware and as acknowledged in your August 14th correspondence, OCR does not have authority to enforce FERPA. Some of OCR's Data Requests, however, appear to directly relate to compliance with FERPA. Please clarify the legal authority for OCR's Data Requests related to FERPA compliance with specific citation to such authority.

As you may know, the School Districts have not been notified of any parent complaint alleging failure to provide access to education records (or failure to comply with any other parent right afforded under FERPA) that has been filed with the SPPO. Consequently, please clarify whether there is a pending parent/guardian complaint alleging a FERPA violation against any of the School Districts. If any parent/guardian of the School Districts has filed a complaint with the SPPO regarding FERPA, please: (a) provide a copy of the complaint and/or the specific complaint allegations to the appropriate School District, (b) identify the specific provision of FERPA that is alleged to have been violated so that the School District can provide a meaningful response; and (c) identify the SPPO representative who is assigned to the complaint by name, title, and contact information.

With regard to OCR's request for "*A copy of all documentation submitted by the District to the Kansas Department of Education requesting or applying for federal funding, including formula and discretionary grants*", the School Districts' understanding is that the U.S. Department of Education readily has access to such records. Please clarify whether or not the U.S. Department of Education has access to documents submitted by the School Districts related to federal funding. Please also clarify how such records would be relevant to this investigation or would be determinative of the School Districts' compliance with FERPA or Title IX.

With regard to OCR's Data Requests concerning "*interscholastic athletic and intramural programs*", the School Districts seek clarification regarding the specific civil rights compliance concern that OCR is investigating. The School Districts are all members of the Kansas State High School Activities Association (KSHSAA) and are subject to KSHSAA's policies and rules. After the Kansas legislature passed the Fairness in Women's Sports Act (K.S.A. §§ 60-5601 *et. seq*) in 2023, KSHSAA modified its participation policy. The current KSHSAA policy requires that interscholastic activities "shall be expressly designated as one of the following based on biological sex: 1. Males, men, or boys, 2. females, women, or girls; or 3. coed or mixed."[1]

As KSHSAA members, the School Districts must, and do, comply with this participation policy. If any parent/guardian of a School District student has filed a complaint with OCR regarding the KSHSAA participation policy, please: (a) provide a copy of the complaint and/or the specific complaint allegations to the appropriate School District and to KSHSAA, and (b) identify the specific provision of Title IX that is alleged to have been violated so that the School District can provide a meaningful response.

With regard to OCR's Data Requests regarding "*sex-separated restrooms, locker rooms, or changing rooms*", the School Districts seek clarification regarding the specific civil rights compliance concern that OCR is investigating. The School Districts' school buildings are each outfitted with typical sex-separated restrooms and locker rooms that would be present in any school building or other public building. The School Districts ensure students and staff have equal access to facilities, and they ensure equivalent quality and availability of athletic facilities. If any parent/guardian of the School Districts has filed a complaint with OCR regarding equal access to facilities, please: (a) provide a copy of the complaint and/or the specific complaint allegations to the appropriate School District, and (b) identify the specific provision of Title IX that is alleged to have been violated so that the School District can provide a meaningful response.

Thank you in advance for providing the requested clarification. The undersigned counsel have had minimal time to review the Data Requests and may have additional questions and requests for clarification as we work with OCR to resolve this investigation. The undersigned counsel are amenable to meeting with you to discuss the requested points of clarification and to provide information about the School Districts' practices with regard to working with transgender students and their families. We are confident that, through a civil and constructive discussion about the common sense manner in which our school staff work with parents and transgender students, any civil rights compliance concerns can be dispelled.

---

[1] *See* KSHSAA Policies for Transgender Student Participation, available here: https://www.kshsaa.org/Public/PDF/TransgenderPolicyRecommendations.pdf

Greg Goheen, Legal Counsel
ggoheen@mvplaw.com
Kansas City, Kansas School District U.S.D. 500

Chris Pittman, Staff Counsel
capittman@olatheschools.org
Olathe School District U.S.D. 233

Rachel England, General Counsel
rachelengland@smsd.org
Shawnee Mission School District U.S.D. 512

Donna Whiteman, General Counsel
dwhiteman@tps501.org
Topeka School District U.S.D. 501

UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON, D.C. 20202

August 22, 2025

**EXHIBIT U**

Dr. Anna Stubblefield
Superintendent of Schools
Kansas City Kansas Public Schools, U.S.D. 500
2010 N. 59th Street
Kansas City, KS 66104

Sent via email only, to: anna.stubblefield@kckps.org

OCR Case No. 07251501
SPPO Case No. 25-0738

Dear Dr. Stubblefield:

Enclosed with this letter is an initial Data Request for information. The Department will create a secure link to SharePoint in which the requested documents and information should be uploaded. **Please submit the requested information via SharePoint link by close of business September 5, 2025**. In order for your team to upload data to the link, we need you to provide a list of specific names and email addresses of the members of your team you designate to provide the data**.** You and the members of your team will be emailed a link to the SharePoint site following receipt of your list of names and email addresses**.** Please email the list of names and email addresses of your team who should be granted access to the SharePoint site to Bradley.Burke@ed.gov **by the close of business August 27, 2025**. Once I receive the list, I can send the SharePoint link to you and your team.

All data responses should be submitted via SharePoint, but other communication may be sent via e-mail. When contacting OCR about this investigation via e-mail, please include in the subject line of any e-mail correspondence and in any other communication, a reference to the case numbers at the top of this letter.

If you have any questions regarding this Data Request relating to Title IX, please contact Bradley.Burke@ed.gov, or relating to FERPA, please contact FERPA.ComplaintResponse@ed.gov.

Respectfully,

BRADLEY BURKE Digitally signed by BRADLEY BURKE
Date: 2025.08.22 11:03:05 -05'00'

Bradley R. Burke
Regional Director
Office for Civil Rights

Enclosure

**United States Department of Education**
**Data Request**

**OCR Case Number:** 07251501

**SPPO Case Number:** 25-0738

**Recipient:** Kansas City Kansas Public Schools, U.S.D. 500 (the District)

---

Please submit the following information to the SharePoint link, by close of business **September 5, 2025**. If any item in this request is unclear, or if you experience any difficulty complying with this request, please contact Bradley.Burke@ed.gov or FERPA.ComplaintResponse@ed.gov **prior to September 5, 2025.** If any responsive documents contain Social Security numbers, **please redact all Social Security Numbers** before producing the documents to OCR and SPPO.

**Preservation of requested and relevant data and documents:** OCR and SPPO may request supplemental data and documents that are relevant to the allegation(s) under investigation. To ensure that OCR and SPPO can assess the recipient's compliance with the statutory and regulatory obligations at issue in this investigation, please ensure that recipient employees and contractors preserve the data and documents requested below for the timeframe specified in these requests and going forward, until you are notified by OCR and SPPO that this matter is resolved. **Please also ensure that recipient employees and contractors preserve other data and documents that are relevant to the issues identified in the Notification Letter** until OCR and SPPO notify you that this matter is resolved.

Separate and complete responses are required for each request. These requests are continuing in nature, and Recipient is under a duty to amend, supplement, or correct any response or production to these requests. Your response to these requests should include all responsive documents in your possession, custody, or control, or the possession, custody, or control of any of your predecessors, successors, employees, contractors, agents, servants, representatives, or attorneys. Where any information required of a recipient is in the exclusive possession of any other agency, institution or person and such agency, institution or person shall fail or refuse to furnish the information to the recipient, the recipient shall notify OCR of the efforts the recipient has made to obtain the information. All non-identical copies of every document whose production is requested should be separately produced.

All documents produced in response to an individual request shall be physically segregated from documents produced in response to any other requests, and the request to which they are responsive shall be specifically identified. If a document is responsive to more than one request, please specify each of the requests to which the document is responsive. Documents shall be retained in the order in which they were maintained in the file where found.

For the purpose of reading, interpreting, or construing the scope of a request, the terms used (including any purported ambiguity) shall be given their most expansive and inclusive interpretation. A variant of any defined term (e.g., "include" is a variant of "including") shall have the appropriate contextual meaning of the defined term's variant. The singular of any word includes the plural and vice versa, and should be given whichever meaning that makes the Request more expansive and inclusive. The past tense of any word includes the present tense and vice versa, unless the change in tense distorts the clear meaning of the phrase. The terms "and" or "or" each should be construed conjunctively or disjunctively, and should be given whichever meaning that makes the request more expansive and inclusive. "Document" shall have the broadest meaning and includes all forms of written, printed, recorded, electronic, or graphic material – whether draft or final, original or copy – regardless of form or format. This includes correspondence, emails, memoranda, meeting notes, reports, policies, manuals, guidance, recordings, photographs, spreadsheets, data compilations, handbooks, contracts, websites, social media content, and any other tangible or electronic material in the possession, custody, or control of the Defendant or its agents. The term "communication" means any oral, written, or electronic transmission of information, including correspondence, emails, online chats, social media messages, meetings, or phone calls, and includes all associated records or summaries. "Relate," "relate to," "relating to," or "regarding" means showing, reflecting, being evidence of, memorializing, referring to, constituting, or concerning any portion of the subject matter of the facts, contentions, or matter referenced in the request.

**Notice on the Recipient's obligation to provide responsive information**

The Title IX implementing regulation relating to access to sources of information is found at 34 C.F.R. § 106.81, which incorporates the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. Those procedures state in relevant part at 34 C.F.R. § 100.6:

> (c) *Access to sources of information.* Each recipient shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part. Where any information required of a recipient is in the exclusive possession of any other agency, institution or person and this agency, institution or person shall fail or refuse to furnish this information the recipient shall so certify in its report and shall set forth what efforts it has made to obtain the information. **Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part.** Information of a confidential nature obtained in connection with compliance evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

In addition, in accordance with the regulation implementing the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, at 34 C.F.R. § 99.31(a)(3)(iii), and the Title VI regulation at 34 C.F.R. § 100.6(c), OCR and SPPO may review personally identifiable

records without regard to considerations of privacy or confidentiality. OCR and SPPO will take all proper precautions to protect the identity of any individuals named in the documents.

**Data Request**

Unless otherwise indicated below, **for the school years 2023-2024, 2024-2025, and 2025-2026**, provide the following information **without redactions** (however no social security numbers should be provided), or indicate in writing if any of the requested information does not exist. Identify all responsive documents that have been lost, discarded, or destroyed. In so doing, state the type of document, its date, the approximate date it was lost, discarded, or destroyed, the circumstances under which it was lost, discarded, or destroyed, and the identity of each person having knowledge of the contents thereof.

Provide the following information:

1. The name, title, and contact information for:
    a. The District's point of contact for this investigation; and
    b. The individual authorized by the District to resolve any concerns identified or findings of noncompliance.

2. The name, job title, and current contact information for any District employee or representative with information relevant to the issues OCR and SPPO are investigating.

3. A copy of all documentation submitted by the District to the Kansas Department of Education requesting or applying for federal funding, including formula and discretionary grants.

4. Provide a copy of all policies, practices, rules, and guidance documents the District has instituted to ensure that the District complies with its FERPA requirements.

5. Provide a statement identifying all interscholastic athletic and intramural programs operated wholly or in part by the District, or on behalf of the District. Include whether the program is separated by sex, what year the program was first offered for each sex, when the program ended - if applicable, and the number of students who participated in each program disaggregated by sex.

6. If the District does not wholly operate interscholastic athletic or intramural programs, provide a copy of the procedure the District has adopted that is designed to assure the District that the operator or sponsor of such education program or activity takes no action affecting any student that the District would be prohibited from taking under Title IX. If the District has not developed and implemented such a procedure, indicate so in response to this item, and explain why the District has not implemented such a procedure.

7. Provide a statement describing what assistance the District provides directly or indirectly to any provider of interscholastic athletic or intramural programs offered to District students that is not wholly operated by the District.

8. Provide a statement describing whether the District provides sex-separated interscholastic athletic and intramural programs, when each program began, and why the programs are separated by sex.

9. Provide a statement describing whether the District provides sex-separated restrooms, locker rooms, or changing rooms, when the District began providing sex-separated restrooms, locker rooms, or changing rooms, and why the District provides sex-separated restrooms, locker rooms, or changing rooms.

10. Provide a statement describing all guidance the District has received that relates or refers to student participation in sex-separated interscholastic athletic or intermural programs based on a student's "gender identity" or similar terms. Indicate who provided the guidance, when the guidance was received, and provide a copy of all written guidance received and a description of all oral guidance received.

11. Provide a statement describing all guidance the District has received that relates or refers to utilization of District provided sex-separated restrooms, locker rooms, or changing rooms, based on a student's "gender identity" or similar terms. Indicate who provided the guidance, when the guidance was received, and provide a copy of all written guidance received and a description of all oral guidance received.

12. Provide a copy of all communications between the Kansas Department of Education and the District, and all communications between any other entity or individual and the District, that relate or refer to male students being eligible to compete in interscholastic athletic or intramural programs designated for female students, or to the ability of a student to participate in sex-separated interscholastic athletic or intermural programs based on a student's "gender identity" or similar terms.

13. Provide a copy of all communications between the Kansas Department of Education and the District, and all communications between any other entity or individual and the District, that relate or refer to students being permitted to utilize District provided sex-separated restrooms, locker rooms, or changing rooms, based on the student's "gender identity" or similar terms.

14. Provide a statement describing all guidance the District has provided to staff, parents/guardians, and students, that relates or refers to student participation in sex-separated interscholastic athletic or intermural programs based on a student's "gender identity" or similar terms. Provide a copy of all written guidance and a description of all oral guidance, and a copy of all related staff training material.

15. Provide a statement describing all guidance the District has provided to staff, parents/guardians, and students, that relates or refers to the use of District provided sex-separated restrooms, locker rooms, or changing rooms, based on an individual's "gender identity" or similar terms. Provide a copy of all written guidance and a description of all oral guidance, and a copy of all related staff training material.

16. Provide a copy of all District policies, practices, rules, and guidance documents, and all related staff training material, that relate or refer to students being able to compete in sex-separated interscholastic or intramural athletic programs based on their "gender identity" or similar terms. Include any amendments to such policies, practices, rules, and guidance documents, and indicate the respective effective date(s) for such amendments. Provide minutes from any meetings relating to the adoption or amendment of such policies, practices, rules, and guidance documents.

17. Provide a copy of all District policies, practices, rules, and guidance documents, and all related staff training material, that relate or refer to employees or students being able to utilize District provided sex-separated restrooms, locker rooms, or changing rooms, based on "gender identity" or similar terms. Include any amendments to such policies, practices, rules, and guidance documents, and indicate the respective effective date(s) for such amendments. Provide minutes from any meetings relating to the adoption or amendment of such policies, practices, rules, and guidance documents.

18. Provide a list of any District students who have been permitted to participate in sex-separated interscholastic athletic or intramural programs based on the student's "gender identity" if the student's "gender identity" is different from the student's sex. Include the athletic program involved, the dates of participation, the head coach's name and contact information, a roster of the team, and the team's schedule for that season.

19. Provide a list of all complaints received by the District alleging that a male student participated on behalf of the District or against any student enrolled in the District in any interscholastic athletic or intramural program or activity that was designated for female students. Include the event, the date and location of the event, and the name and contact information of the head coach(s) for the team(s) involved. For any complaints received by the District related to such allegations, provide a copy of the investigative file with findings or an explanation of why an investigation was not conducted. Records include all internal and external correspondence, e-mail, voicemail, text messages, videos, notes, logs, reports, etc.

20. Provide a list of all complaints received by the District alleging that a student or employee utilized a District provided sex-separated restroom, locker room, or changing room, based on "gender identity" or similar terms. For any complaints received by the District related to such allegations, provide a copy of the investigative file with findings or an explanation of why an investigation was not conducted. Records include all internal and external correspondence, e-mail, voicemail, text messages, videos, notes, logs, reports, etc.

21. Provide a description of any action taken by the District related to the alleged failure or refusal of any student, parent/guardian, or employee to comply with the Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-Conforming Students at School.

22. Provide a description of any action taken by the District related to any student, parent/guardian, or employee complaints about, or opposition to, the Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-Conforming Students at School.

23. Provide a description of all instances in which a parent/guardian alleged or complained that the District failed or refused to provide student records to the parent/guardian relating to the student's gender transition status or plan or related accommodations. For each allegation, provide a copy of the investigative file with findings or an explanation of why an investigation was not conducted. Records include all internal and external correspondence, e-mail, voicemail, text messages, videos, notes, logs, reports, etc.

24. Provide a description of all instances in which the District charged a fee to a parent/guardian to search for or to retrieve the education records of a student, including any records related to a student's gender transition status or plan or related accommodations.

25. Provide a description of any instance in which District staff, in communicating with a parent/guardian, chose to not disclose or communicate to the parent/guardian, the student's "transgender" status, "gender non-conforming presentation," "gender identity," "gender status," or preferred pronouns, because of the student's request or for any other reason.

26. Provide a copy of all communications from the District regarding OCR's and SPPO's investigation of this complaint.

27. Provide the names and titles of all individuals who assisted in the preparation of these data responses.

28. You are invited, but not required, to provide a narrative response to this investigation.

29. You may provide any other information you believe will be helpful to OCR or SPPO in resolving this investigation.

END

UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON, D.C. 20202

August 14, 2025

EXHIBIT
V

Dr. Anna Stubblefield
Superintendent of Schools
Kansas City Kansas Public Schools, U.S.D. 500
2010 N. 59th Street
Kansas City, KS 66104

Sent via email only, to: anna.stubblefield@kckps.org

OCR Case No. 07251501
SPPO Case No. 25-0738

Dear Dr. Stubblefield:

The United States Department of Education (Department), Office for Civil Rights (OCR) and Student Privacy Policy Office (SPPO), writes to inform you that the Department received a complaint alleging the Kansas City Kansas Public Schools, U.S.D. 500 (the District) has a policy, procedure, or guidance (hereinafter policy) that permits male students to participate in interscholastic and intramural athletic programs designated for female students, and allows students to use restrooms and locker rooms designated for the opposite sex based on a student's "gender identity," in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its implementing regulation 34 C.F.R. Part 106. The complaint also alleges the District has a policy that prevents school officials from disclosing a student's "transgender status" to the student's parents unless authorized by the student, in violation of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and its implementing regulation at 34 C.F.R. Part 99.

**TITLE IX**

OCR enforces Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its implementing regulation, 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any education program or activity operated by a recipient of Federal financial assistance. As a recipient of federal financial assistance from the Department, the District is subject to Title IX and to OCR's enforcement jurisdiction.

Pursuant to its regulatory authority, as set forth in 20 U.S.C. § 1682, 34 C.F.R. § 106.81, and 34 C.F.R. § 100.7, OCR may initiate an investigation whenever a report, complaint, or other information indicates a possible failure to comply with the laws and regulations that OCR enforces.

OCR is opening an investigation to examine whether the Kansas City Kansas Public Schools, U.S.D. 500, policy permits male students to participate in interscholastic and intramural athletic

programs designated for female students, and/or permits students to use restrooms and locker rooms designated for the opposite sex, in violation of Title IX and its implementing regulations.

**FERPA**

SPPO enforces the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and its implementing regulations at 34 C.F.R. Part 99. Pursuant to its regulatory authority, as set forth in 20 U.S.C. §1232g(f), 34 C.F.R. § 99.60, 34 CFR §§ 99.64 and 99.65, SPPO may investigate complaints and take appropriate action to enforce FERPA.

FERPA provides that parents have the right to inspect and review their children's education records, which are defined as records, files, documents, and other materials that are directly related to a student and maintained by an educational agency or institution, or by a party acting for the agency or institution. 20 U.S.C. § 1232g(a)(l)(A); 34 CFR Part 99, Subpart B, and § 99.3 ("Education records"). Once a student reaches 18 years of age or attends a postsecondary institution, all FERPA rights transfer from parents to the student. 34 CFR §§ 99.3 ("Eligible student") and 99.5. For this notification's purposes, we assume that the students in question are not "eligible students" and that the parents retain their right to inspect and review their children's education records under FERPA.

The complaint alleges that the District has a policy that interferes with the right of parents to inspect and review their minor children's education records. Specifically, the policy states (emphasis added):

> School personnel should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others, *including parents* and other school personnel, unless legally required to do so or unless the student has authorized such disclosure."

While the inclusion of "unless legally required to do so" may be interpreted to imply some deference for other factors that could include federal laws such as FERPA, the policy could be interpreted to give school officials discretion that would ultimately infringe on the rights of a parent under FERPA. Moreover, this type of scenario is addressed in U.S. Secretary of Education Linda McMahon's cover letter that included the following strong reminder to state and local education authorities:

> By natural right and moral authority, parents are the primary protectors of their children. Yet many states and school districts have enacted policies that presume children need protection from their parents. Often, such policies evade or misapply [FERPA], turning the concept of privacy on its head to facilitate ideological indoctrination in a school environment without parental interference or even involvement. Going forward, the Department of Education will insist that schools apply FERPA correctly to uphold, not thwart, parents' rights.

SPPO is opening an investigation to determine whether the District policy violates FERPA and its implementing regulations. The Department has a number of enforcement options available to

bring a covered entity into compliance with FERPA, including withholding further payments, issuing a cease and desist order, and recovering funds. See 34 CFR § 99.67 and 20 U.S.C. § 1234c. The Court of Appeals in *United States v. Miami University,* 294 F.3d 797, 808 (6th Cir. 2002) also concluded that the United States has the inherent power to sue to enforce conditions imposed under FERPA on the recipients of federal grants. However, this Office is committed to working with the District to ensure voluntary compliance with FERPA as provided under § 99.66(c)(2) of the regulations.

The initiation of an investigation is not itself evidence of a violation of federal civil rights laws and regulations. However, District's Kansas City Kansas Public Schools Guidelines for Transgender and Gender Non-Conforming Students at School, appears to adopt a position in irresolvable conflict with Federal law.

During the investigation, OCR and SPPO are neutral; OCR and SPPO will collect and analyze the evidence needed in order to make a decision about the complaint. OCR will ensure that its investigation is legally sufficient in accordance with OCR's Case Processing Manual (February 19, 2025). OCR and SPPO will reach out to you shortly with a data request.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information, that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

OCR's Kansas City enforcement office will lead the Title IX investigation, while SPPO will lead the FERPA investigation. Should you have any questions regarding OCR's investigation, please do not hesitate to contact Bradley.Burke@ed.gov. Questions regarding FERPA may be directed to FERPA.ComplaintResponse@ed.gov.

Respectfully,

BRADLEY BURKE Digitally signed by BRADLEY BURKE Date: 2025.08.14 06:42:20 -05'00'

Digitally signed by FRANK MILLER Date: 2025.08.13 20:43:14 -04'00'

Bradley R. Burke
Regional Director
Office for Civil Rights

Frank E. Miller Jr.
Acting Director
Student Privacy Policy Office